## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

JOEL GREENE,

        Plaintiff,

    v.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA, et.
al.,

        Defendants.

CIVIL ACTION NO.: 4:21-cv-277

## **O R D E R**

Plaintiff Joel Greene brought this case in the State Court of Chatham County, Georgia, after his infected toe fell off while he was incarcerated at Coastal State Prison. (Doc. 1, pp. 30–45.)  Plaintiff's remaining claims are (1) a medical malpractice claim asserted against Defendants Board of Regents of the University System of Georgia ("BOR"), the Georgia Department of Corrections ("GDC"), Physician Assistant ("P.A.") Latoya Hall, and Dr. Olatunji Awe; and (2) an Eighth Amendment deliberate indifference claim asserted against Hall in her individual capacity pursuant to 42 U.S.C. § 1983.[1]  There are numerous motions presently before the Court: (1) GDC's Motion for Summary Judgment and BOR's Motion for Partial Summary Judgment, which have been consolidated and briefed together, (docs. 90); (2) Hall's Motion for Summary Judgment, (doc. 92); (3) GDC, BOR, and Hall's Motion to Exclude portions of the opinions of

---

[1]  In its Order dated August 1, 2022, the Court dismissed Plaintiff's Eighth Amendment claims against Awe (in his official and individual capacities) and Hall (in her official capacity).  (Doc. 64.) The Court also dismissed any Eighth Amendment claims asserted against BOR and GDC.  (Id.)

Plaintiff's expert, Dr. Robert Powers, (doc. 93); and (4) Plaintiff's Consolidated Motion for Partial Summary Judgment, Motion to Exclude the Opinions of Defendants' Experts, and Motion to Reconsider the Order dismissing Plaintiff's federal claims asserted against Awe, (doc. 100). The issues have been fully briefed. (Docs. 91, 92-2, 93, 100-1, 135–40, and 145–50.)

For the reasons stated below, the Court **GRANTS** GDC's Motion for Summary Judgment as to the claims asserted against GDC, (doc. 90), **DENIES** BOR's Motion for Partial Summary Judgment as to Plaintiff's claims based on Dr. Arlene Wilson's alleged negligence, (id.), **DENIES** Hall's Motion for Summary Judgment, (doc. 92), **DENIES as moot** BOR, GDC, and Hall's Motion to Exclude portions of Plaintiff's proffered expert's opinion, (doc. 93), **GRANTS in part and DENIES in part** Plaintiff's Motion for Partial Summary Judgment, (doc. 100), **GRANTS in part and DENIES in part** Plaintiff's Motion to Exclude certain portions of Defendants' experts' opinions, (id.), and **DENIES** Plaintiff's Motion for Reconsideration, (id.).

## BACKGROUND

### I.    Factual History

#### A.    Plaintiff's Medical Issues and 2017 Amputations

Plaintiff is a former state prisoner who was confined at Coastal State Prison (the "Prison") beginning in 2017 through at least December 2019. (Doc. 137-1, p. 1; doc. 138-1, p. 2.) Plaintiff suffers from several chronic medical conditions, including Type II diabetes and peripheral vascular disease ("PVD"). (Doc. 137-1, pp. 1–2; doc. 138-1, p. 2.) In October 2017, Plaintiff was hospitalized for treatment of diabetic foot ulcers on his left foot, and ultimately had his big toe, pinky toe, and a portion of the side of his foot

amputated.  (Doc. 137-1, pp. 6–7.)  After the amputations, Plaintiff underwent surgery to have several stents placed into the arteries in his left leg because his left superficial femoral artery was occluded (i.e., clogged) and inhibiting his foot's ability to heal.  (Id. at p. 7.)

**B.** **Plaintiff's Medical Issues Culminating in the Autoamputation of His Left Second Toe in June 2019**

**(1)** **Plaintiff's "Sick Call" on April 23 with Nurse Gatewood**

On April 19, 2019, Plaintiff noticed that his entire left food had swollen up overnight due to an abrasion/opening that had formed on the top of his left second toe.  (Id. at p. 9.)  Plaintiff put in a "sick call" request and was seen by nurse Melissa Gatewood on April 23.  (Id.)  Gatewood's notes for the visit indicate that Plaintiff had a "small open area" on the left second toe and that "pedal pulses [were] present."  (Id.; doc. 108-1, p. 31.)  Gatewood assessed Plaintiff as having "possible cellulitis."  (Doc. 108-1, p. 31; doc. 122, p. 24.)  Under the "disposition" section of the notes, Gatewood checked the "urgent" box and listed the date "4/23/19," (doc. 108-1, p. 31), which she testified meant that Plaintiff was to be seen by an advanced level provider ("ALP") that same day, (doc. 122, pp. 26, 28–29).

**(2)** **Plaintiff's Appointment with Dr. Awe on April 25 or 26**

Awe, the Prison's medical director, saw Plaintiff on April 25 or April 26.  (Doc. 137-1, pp. 5, 10.)  Awe testified that Plaintiff's left food had a "little sore" on it as well as "some redness" and "some warmth," the latter two of which are "clinical features of [] an infection, cellulitis."  (Id. at p. 10 (quoting doc. 119, pp. 22, 51).)  Awe also testified that Plaintiff's "peripheral pulses were good."  (Doc. 119, p. 23.)  Awe knew at the time that Plaintiff had PVD, had suffered prior amputations to the same foot, and had received stenting to restore blood flow to that foot.  (Doc. 137-1, p. 10; see doc. 119, p. 24.)  Awe

prescribed Plaintiff daily bandage changes, ten days of Clindamycin (an oral antibiotic) for the infection, and Lasix (a water pill) for the swelling. (Doc. 137-1, p. 11; see doc. 107-1, p. 14.) Awe additionally scheduled Plaintiff to return to the clinic in three weeks. (Doc. 137-1, p. 11; see doc. 107-1, p. 14.)

### (3)    Plaintiff is Seen by Dr. Wilson on May 3 and May 16

Plaintiff returned to the Prison's medical center on May 3 and was seen by Dr. Arlene Wilson. (Doc. 137-1, p. 12.) At that point, Plaintiff had been on Clindamycin for nine days without improvement, and his second toe had developed a "superficial ulcer." (Id. (quoting doc. 108-1, p. 30).) Wilson knew that Plaintiff had PVD and prior amputations to his left foot but did not think it was necessary to urgently refer him to a vascular surgeon for arterial studies because Plaintiff had "palpable peripheral pulses," his skin was "warm to touch," his "capillary refill was normal," and there was "no necrosis." (Id. (quoting doc. 121, p. 32); doc. 121, p. 70.) Instead, Wilson discontinued Clindamycin, placed Plaintiff on different antibiotics, and ordered daily bandage changes.[2] (Id.)

Although Wilson told Plaintiff that he would be scheduled for a follow-up appointment within four to five days, Wilson did not see Plaintiff until May 16 (thirteen days later). (Doc. 137-1, pp. 12–13; see doc. 108-1, p. 29.) Wilson's notes from the visit indicate that Plaintiff's toe was still infected, describe the skin on his foot as "red," and list

---

[2] The nurses who were performing the daily dressing changes realized that Plaintiff's toe had been "off" for a while and that what they were doing was not helping, so they voiced concerns and placed requests for Awe or another ALP to examine him. (Doc. 137-1, p. 19; see doc. 36, pp. 36–37; doc. 117, p. 2.) Specifically, Gatewood expressed concerns to Vinetta Parker, a nurse in the emergency room, at least twice about Plaintiff's toe and told Parker that she (Gatewood) had shared these concerns with either Awe or some other ALP. (Doc. 137-1, p. 20.) Plaintiff additionally testified that Gatewood told him that she had asked Awe to re-examine his toe multiple times, but Awe did not answer her. (Doc. 137-1, p. 20; doc. 118, p. 91.)

the degree of control of Plaintiff's PVD as "fair."  (Doc. 108-1, p. 29; doc. 137-1, p. 13; doc. 121, pp. 49, 52.)  Because Plaintiff's foot was not healing, Wilson requested that Plaintiff be referred to an outside wound care clinic on an urgent basis.  (Doc. 137-1, p. 13.)  Wilson testified that she did so because the Prison "only had certain types of dressings" and "sometimes you need special dressings in order to clear up a wound infection." (Doc. 121, p. 35.)  Wilson further testified that she referred Plaintiff to wound care—instead of a vascular surgeon or specialist—"on the assumption that there was adequate blood flow to [Plaintiff's] extremity." (Id. at p. 36; see id. (stating that, in general, if she had seen a patient who lacked a "palpable pulse," indicating "restricted blood flow to the extremity," she "would not have referred them to wound care" because wound care "wouldn't have been able to help [the patient] in that situation").)  Awe signed off on Wilson's wound care referral after discussing it with her and, thus, knew that Plaintiff's toe had not improved.  (Doc. 137-1, p. 14.)  Neither Awe nor Wilson ever referred Plaintiff to a vascular surgeon because of Plaintiff's May 16 visit.  (Id.)

### (4)    Plaintiff's Visit to the Wound Care Clinic on May 29

Plaintiff saw Dr. Douglas Hanzel at St. Joseph's Candler Center for Hyperbarics & Wound Care on May 29, 2019.  (Doc. 137-1, p. 21.)  This was the first time that Plaintiff had seen an outside provider about his toe.  (Id.)  Hanzel's records state that Plaintiff's left foot had no palpable pulse, a weak dorsalis pedis pulse with doppler, and no posterior tibial pulse with doppler.  (Doc. 119-2, p. 12; see doc. 119, pp. 28, 35.)  Hanzel described Plaintiff's wound as an "open diabetic ulcer" that was worsening due to "poor circulation." (Doc. 119-2, p. 15.)  He further stated that the toe looked like it was almost autoamputated, and he noted that "there [was] tendon exposed," a "large amount of serosanguineous

drainage," and "a medium (34-66%) amount of necrotic tissue within the wound bed." (Doc. 137-1, p. 22 (quoting doc. 119-2, pp. 12, 15, 17).)  Hanzel also stated that Plaintiff "surely will need another vascular eval[uation]" because he suspected Plaintiff "may not have adequate circulation to heal [his] toe ulcer." (Id. (quoting doc. 119-2, p. 18).)  Plaintiff testified that Hanzel told him his toe was "dead" and that Plaintiff needed to see a vascular surgeon about getting it amputated.  (Doc. 118, pp. 46, 48; see doc. 92-4, p. 202 (medical encounter form dated June 5, 2019, which indicates that Plaintiff said he was told by the wound clinic to follow up with "vascular" to have an amputation).)  However, Hanzel's records do not contain any information about what Hanzel personally told Plaintiff.  (See generally doc. 119-2, pp. 10–31.)

### (5)    Plaintiff's Interactions with P.A. Hall on May 30 and June 5

Following Plaintiff's meeting with Hanzel, he was scheduled for a May 30 follow-up appointment with P.A. Hall.  (Doc. 137-1, p. 23; doc. 138-1, p. 6 (admitting that Hall was supposed to see Plaintiff "as a follow up from an outside provider consult[ation]").)  When an inmate is sent to an outside facility for a consultation, they have a follow-up with a provider at the Prison upon their return.  (Doc. 138-1, pp. 6–7.)  According to Hall, the purpose of these follow-ups is to ensure that the outside provider's directions are noted and followed by the Prison's medical unit and its providers.  (Doc. 92-4, p. 4.)

Plaintiff and Hall had not interacted prior to the May 30 appointment, (doc. 138-1, pp. 5–6; doc. 92-4, p. 3), but Hall knew that Plaintiff had a history of PVD, that his toe was infected, and that he had been sent to the wound care clinic, (doc. 137-1, p. 23).  The encounter form from May 30 states that Hall saw Plaintiff for a "consult" and "sick call." (Doc. 108-1, p. 19.)  The form also indicates that no orders or follow-up plan were available

from the wound clinic, but that Hall had requested such records.  (Id.)  Additionally, Hall noted in the form that Plaintiff would be scheduled to be seen once the records were received from the wound clinic.  (Id.; see doc. 92-4, p. 4.)  The form does not indicate that Hall evaluated Plaintiff's toe.  (See doc. 108-1, p. 19.)  Furthermore, Hall testified that she does not remember whether she viewed his foot or whether Plaintiff complained to her about the status of his toe on May 30.  (Doc. 120, pp. 19–20.)

Plaintiff's account of the May 30 encounter with Hall is markedly different. According to Plaintiff, he "sat in the front room for five and a half hours . . . and . . . caught [Hall] as she was leaving out the door," at which point she told him, "Oh, I don't got anything for you to do today and I got to go eat lunch, bye."  (Doc. 118, p. 49; see also id. at p. 94 (stating that Hall "blew [him] off completely").)  Hall testified that she "did not tell [Plaintiff] that [she] would not treat his wound because [she] had to eat lunch," but rather, as documented in the encounter form, "took steps to obtain the orders from the wound care clinic . . . to make sure the treatment of the wound would be consistent with the specialist's plan and instructions."  (Doc. 92-4, p. 4.)

Plaintiff's second encounter with Hall occurred on the afternoon of June 5.  That day, Plaintiff was sent to Augusta State Medical Prison ("ASMP") for a CAT scan follow-up related to his renal cancer.  (Doc. 137-1, p. 25.)  Plaintiff saw Hall when he returned to the Prison that afternoon as a follow-up to his visit to ASMP.  (Id.; doc. 138-1, p. 11; doc. 120, p. 21.)  According to Plaintiff, Hall told him that she still did not have any information from wound care, at which point he took off his shoe, which was full of blood, and said, "let's do something about this."  (Doc. 118, p. 52.)  Plaintiff testified that Hall responded, "Oh I guess we ought to do something about that," and they went to the Prison's E.R. to

have the dressings changed.  (Id. at pp. 52–53.)  Plaintiff testified that, when the nurse unwrapped it, Hall said, "Don't be showing me shit like that, it will make me lose my lunch."  (Id. at p. 53.)  Hall concedes that Plaintiff showed her his foot and she examined it on June 5.  (Doc. 120, p. 22.)  However, Hall denies that she made the statement about her lunch and insists that her interaction with Plaintiff "was limited and as documented" in the medical encounter form from June 5 (discussed below).  (Doc. 92-4, p. 6.)

The medical encounter form Hall completed on June 5 states that Plaintiff was seen "last week for [a follow-up] to wound care," but that "no plan was on the chart."  (Doc. 108-1, p. 15.)  The form further notes that "[Plaintiff] stated he was told by [the] wound clinic that he was supposed to [follow-up] [with] Vascular to have an amputation."  (Id.)  The form indicates that Hall put Plaintiff back on oral Clindamycin,[3] and ordered him to follow-up with the wound care clinic in two weeks.  (Id.)  Hall indicated on the encounter form that she instructed Plaintiff to "ask [the] wound clinic about vascular referral on his next visit."  (Id.)  Finally, the form states that "wound orders [were] written" and contains a notation to "see orders."  (Id.)  On a contemporaneous "Physician's Orders" form, Hall wrote that the wound clinic ordered the following: change dressings daily, cleanse with mild soap and water, and apply Aquacel Extra, dry gauze, and tape.  (Doc. 92-4, p. 204; doc. 138-1, p. 16.)

Hall filled out a consultation request which states, "Please schedule an [appointment] to see wound clinic in 2 weeks."  (Doc. 92-4, p. 206; doc. 138-1, pp. 16–

---

[3]  Plaintiff denies that Hall prescribed him Clindamycin or any other antibiotic.  (Doc. 138-2, p. 3 ("At no time in 2019 did Hall ever prescribe me Clindamycin . . . .").)  Plaintiff's testimony is seemingly corroborated by the absence of a record for this prescription on Plaintiff's prescription log.  (See generally doc. 138-6.)  Thus, there is a genuine dispute of fact as to whether Hall, in fact, "started [Plaintiff on] Clindamycin," as indicated on the form.  (Doc. 108-1, p. 15.)

17.)  Awe approved the appointment.  (Doc. 138-1, p. 17.)  Neither Hall nor Awe referred Plaintiff to a vascular surgeon on June 5.  (Doc. 137-1, pp. 28–29.)  Hall testified that "[t]here was no referral to a vascular surgeon or vascular specialist in the wound care clinic records, and so [she] did not request or inquire about such a referral at that time."  (Doc. 92-4, p. 5; see doc. 120, pp. 36 (noting that the wound clinic "didn't necessarily directly say that [Plaintiff] needed to go to see the vascular surgeon").)  Hall also testified that she was "kind of following wound care's lead in terms of not referring him to a vascular [herself]," that she transcribed the wound clinic's orders because they are the "specialists," and she was only seeing him for a follow-up.  (Doc. 120, pp. 35–36.)

### (6)   Plaintiff's Toe Autoamputates on June 7 and is Surgically Amputated on June 8

Plaintiff's toe fell off while he was in bed on the morning of June 7, and he was taken to the hospital later that day.  (Doc. 137-1, pp. 29, 31.)  The hospital performed an arterial Doppler which revealed that Plaintiff's left superficial femoral artery ("SFA") was completely occluded.  (Doc. 137-1, p. 31; see doc. 108-1, p. 12.)  Plaintiff was operated on the following day to have the remainder of the toe amputated.  (Doc. 137-1, p. 31; doc. 108-1, p. 11.)  A record from the hospital visit describes Plaintiff's injury as "partial amputation on left 2nd toe" and states that the amputated toe tested positive for MRSA. (Doc. 108-1, p. 11.)  On June 10, Plaintiff underwent a revascularization surgery involving, inter alia, the following "[o]perative procedures": "[l]eft lower extremity angiogram"; "balloon angioplasty" of the left common femoral artery and the left profunda artery origin; and a "stent dilation" of the left SFA.  (Doc. 115-1, p. 17.)  The notes from the procedure indicate that the procedure improved blood flow and that Plaintiff had palpable pulses post procedure.  (Id. at pp. 17–18.)

9

### C.      Pertinent Facts About Defendants and the Interagency Agreement

GDC and BOR (collectively, the "State Defendants") are entities of the State of Georgia. (Doc. 1, p. 161; doc. 137-1, p. 32.)  The Prison is owned and operated by GDC. (Doc. 137-1, p. 6.)  Augusta University, whose medical school is called the Medical College of Georgia ("MCG"),[4] is a unit of BOR.  (Doc. 1, p. 161; doc. 137-1, p. 32.)

In 1997, GDC and BOR, the latter acting on behalf of MCG, entered an "Interagency Agreement" in which MCG agreed "to deliver comprehensive healthcare to all GDC prisoners."[5]  (Doc. 117-3, p. 1.)  The title page of the "Scope of Services" section of the Interagency Agreement contains the heading, "Georgia Correctional HealthCare (GCHC)," and states, at the bottom of the page, "A partnership between [GDC]/[MCG]." (Id. at p. 6; see also id. at p. 8 (referring to the "MCG/GDC Partnership").)  Georgia Correctional HealthCare is a "department within Augusta University."  (Doc. 1, p. 161; doc. 137-1, p. 32.)  According to the Medical Director for GDC, Sharon Lewis, "GCHC served as the vendor to provide all physical health care services in the [state's correctional] facilities."  (Doc. 126, pp. 4, 30.)

At all relevant times, Hall has been employed by GCHC while working as a member of the Prison's medical staff.  (Doc. 138-1, p. 3; doc. 92-4, p. 2; see doc. 139-3

---

[4]  The Court takes judicial notice of this fact.  See https://www.augusta.edu/mcg/.

[5]  In their Response to Plaintiff's Statement of Material Facts, State Defendants object to the portions which discuss or cite to the Interagency Agreement, arguing that it is "unauthenticated hearsay" and was not identified "by any witness with knowledge."  (See doc. 137-1, pp. 32–36.) The authentication objection is absurd because State Defendants *produced* the Interagency Agreement during discovery.  Additionally, even if the Interagency Agreement were hearsay (the Court is not weighing in one way or the other), the Court may consider it at summary judgment because it could be reduced to an admissible form at trial.  See Jones v. UPS Ground Freight, 683 F.3d 1283, 1293–94 (11th Cir. 2012) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.").

(letter stating that Hall's "employment with GCHC" was scheduled to begin in October 2015).)  Hall worked under the supervision of Awe and Wilson.  (Doc. 138-1, p. 4; doc. 137-1, p. 5.)  Awe began working at the Prison in 1999 and he, too, has been an employee of GCHC at all relevant times.  (Doc. 137-1, p. 36; see doc. 139-2, p. 1 (Awe's offer for employment with GCHC).)  Wilson served as a locum tenens physician at the Prison for about six months.[6]  (Doc. 137-1, p. 36.)  She was assigned to this position by a staffing agency, Consilium Staffing, LLC ("Consilium").  (Doc. 137-1, p. 37; doc. 139-1, pp. 3–4; see doc. 121, pp. 11–12; see also doc. 119, pp. 12–13.)  Wilson testified that she worked for and was paid by Consilium, but that Consilium did not direct or guide her job performance.  (Doc. 121, pp. 75–76.)  In her role as a locum tenens physician at the Prison, Wilson had to comply with the Standard Operating Procedures ("SOPs") promulgated by GDC.  (Doc. 137-1, p. 37.)

## II.   Procedural History

On August 18, 2021, Plaintiff filed this suit in the State Court of Chatham County against Defendants BOR, GDC, Awe, and Hall (collectively, "Defendants").[7]  (Doc. 1, pp. 30–47.)  Plaintiff originally brought a state law negligence claim against Defendants

---

[6] "Locum tenens" is defined as "one filling an office for a time or temporarily taking the place of another—used especially of a doctor or clergyman."  *Locum tenens*, Merriam-Webster Online Dictionary (2023), https://www.merriam-webster.com/dictionary/locum%20tenens.

[7] The Complaint also named Dr. Wilson, Awemd, Inc. and John/Jane Does 1–10 as Defendants. (Doc. 1, p. 30.)  Plaintiff filed an Amended Complaint substituting Consilium for Jane/John Doe 1. (Doc. 1, pp. 151–52.)  Subsequently, Plaintiff moved for the dismissal of Wilson and Consilium, (docs. 44, 48), and Awemd, Inc., (docs. 82, 85).  Although not addressed by the parties, John/Jane Does 2–10 are still named as Defendants in this case.  "As a general matter, fictitious-party pleading is not permitted in federal court." Turner v. Martin, 521 F. Supp. 3d 1310, 1323 (S.D. Ga. 2021) (quoting Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010)).  Although a limited exception to the rule exists, id., it is not applicable in this case, and, accordingly, the remaining John/Jane Doe Defendants are **DISMISSED** from the case.

collectively and a Section 1983 deliberate indifference claim against Awe and Hall in their individual capacities. (<u>Id.</u> at pp. 41–43; <u>see also</u> doc. 35, pp. 7–8 (clarifying the nature of Plaintiff's Section 1983 claims).) Defendants Awe and Hall then moved to dismiss Plaintiff's Section 1983 claims. (Doc. 34.) In its August 1, 2022, Order (the "Order"), the Court dismissed the claim against Awe but allowed the claim against Hall to proceed. (Doc. 64.) Accordingly, Plaintiff's remaining claims are the negligence claim asserted against all Defendants and the Section 1983 deliberate indifference claim asserted against Hall in her individual capacity.

There are numerous motions pending before the Court. GDC has moved for summary judgment on Plaintiff's claim against it on the ground that it did not employ any of the persons who provided medical care to Plaintiff. (Docs. 90, 91.) BOR similarly has moved for partial summary judgment as to any claim against it based upon Wilson's alleged misconduct on the grounds that it did not employ Wilson. (Docs. 90, 91.) Hall requests summary judgment as to Plaintiff's deliberate indifference claim against her, arguing, *inter alia*, that Plaintiff did not have an objectively serious medical need and that Hall was not subjectively aware of and did not disregard a substantial risk of serious harm. (Docs. 92, 92-2.) Plaintiff, for his part, requests summary judgment on various discrete issues pertinent to his negligence claim, including that Awe, Hall, and Wilson were all employed by GCHC and that GCHC violated the standard of care when its employees failed to refer him to a vascular surgeon. (Docs. 100, 100-1.) Plaintiff also seeks summary judgment that GCHC is a "joint enterprise" of GDC and BOR, and therefore the alleged negligence of GCHC's employees—Awe, Hall, and (according to Plaintiff) Wilson—is imputable to BOR *and* GDC. (Doc. 100-1, pp. 11–13.)

In addition, the parties have moved to exclude certain expert opinions.  Specifically, Plaintiff moves to exclude the opinions of Defendants' experts, Drs. Thomas Horn and Thomas Fowlkes, related to the standard of care, whether the standard of care was violated, and causation.  (Doc. 100-1, pp. 20–22.)  GDC, BOR, and Hall have moved to exclude certain statements contained in the amended report of Plaintiff's expert, Dr. Robert Powers, for being conclusory, irrelevant, and outside the scope of proper expert testimony.  (Doc. 93.)  Finally, Plaintiff asks the Court to reconsider its Order dismissing Plaintiff's deliberate indifference claims against Awe.  (Doc. 100-1, pp. 22–26.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge

13

his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  Thus, the Court will view the record and all reasonable inferences that can be drawn therefrom in Plaintiff's favor.  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (citation and emphasis omitted).

## DISCUSSION

I.  **Whether Liability for Plaintiff's Tort Claim May be Imputed to GDC and/or BOR**

A.  **Overview of Sovereign Immunity, the Georgia Tort Claims Act, and the Parties' Arguments Concerning Imputing Liability to the State Defendants**

In this case, Plaintiff seeks to hold BOR and GDC liable for Awe, Wilson, and Hall's allegedly negligent treatment of his infected toe.  (Doc. 1, pp. 41–43.)  As entities

14

of the state of Georgia, BOR and GDC have sovereign immunity which can only be waived by a constitutional provision or "an Act of the General Assembly that specifically provides that sovereign immunity is thereby waived and the extent of such waiver."  Ga. Const. art. I, § II, para. IX(e).  "The Georgia Tort Claims Act ('GTCA') is one such Act and provides for a limited waiver of sovereign immunity for the torts of State employees while acting within the scope of their employment."  Ga. Dep't of Transp. v. Wyche, 774 S.E.2d 169, 172 (Ga. Ct. App. 2015); see O.C.G.A. § 50–21–23(a) (providing that the state "shall be liable for such torts in the same manner as a private individual or entity would be liable under like circumstances").  The GTCA "constitutes the exclusive remedy for any tort committed by a state officer or employee."  O.C.G.A. § 50–21–25(a).  For purposes of the GTCA, "[s]tate officer or employee" means "an officer or employee of the state . . . and persons acting on behalf or in service of the state in any official capacity, whether with or without compensation, but the term does not include an independent contractor doing business with the state."  O.C.G.A. § 50–21–22(7).  Plaintiff, as the party seeking to benefit from the waiver of sovereign immunity, bears the burden of proving that the GTCA's waiver applies to his claims against the State Defendants.  Coosa Valley Tech. Coll. v. West, 682 S.E.2d 187, 190 (Ga. Ct. App. 2009).  To meet that burden, Plaintiff must prove that Awe, Wilson, and Hall—the medical personnel whom Plaintiff contends were negligent—were state officers or employees and that they were "acting within the scope of their official duties or employment" at the time of their alleged misconduct.  Id. at 191.

Plaintiff has attempted to meet that burden by showing that Awe, Wilson, and Hall were all employees of GCHC, which, he contends, is a "joint enterprise" of BOR and GDC. (Doc. 100-1, p. 11–15; doc. 139, pp. 2–8.)  Therefore, according to Plaintiff, BOR and

GDC are jointly liable for the negligent acts and omissions committed by all three individuals within the scope of their employment under the GTCA. (Doc. 139, pp. 3–4; doc. 100-1, p. 13.) GDC generally contends that its sovereign immunity has not been waived because it did not employ any of the individuals who provided care to Plaintiff and because the GTCA permits only a single entity of the State to be sued for the alleged tort of a state employee. (Doc. 91, pp. 6–7; doc. 137, p. 3.) According to GDC, "[s]overeign immunity . . . has not been waived for a claim against another state entity on the basis of a common law claim of joint enterprise." (Doc. 137, p. 3.) BOR, for its part, argues that it has sovereign immunity from claims based on Wilson's conduct because she was not an "employee" of the State under the GTCA. (Doc. 91, pp. 7–10.)

**B.**    **Whether Liability May be Imputed to BOR for Awe, Hall, and/or Wilson's Conduct**

**(1)**    **BOR's sovereign immunity is waived for Awe and Hall's conduct because they were employees of GCHC (and thus BOR).**

It is undisputed that "Awe and Hall were employees of *GCHC*–Awe since 1999 and Hall since 2015." (Doc. 137-1, p. 36 (emphasis added).) BOR further concedes that it was the employer of the medical personnel working for GCHC because GCHC "is a department within Augusta University, which is a unit of the BOR." (Doc. 91, p. 7.) Accordingly, the Court finds that BOR's sovereign immunity is waived for any negligent acts taken by Awe and Hall during the course of their employment, and liability for such acts is imputable to BOR. Plaintiff's Motion is therefore **GRANTED** on this issue.

(2)     **There is a genuine dispute of fact concerning Wilson's employment status, which precludes summary judgment as to BOR's potential liability and entitlement to sovereign immunity.**

Both the State Defendants and Plaintiff request summary judgment with respect to Dr. Wilson's employment status.  Plaintiff contends that Wilson was an "employee" of GCHC (and therefore BOR), not an "independent contractor" under the GTCA, and, therefore, the GTCA's waiver of sovereign immunity applies to BOR.  (Doc. 100-1, pp. 13–15; doc. 139, pp. 4–8.)  The State Defendants, in contrast, contend that Wilson was not an "employee" of BOR because GCHC did not control the material aspects of her job, and, accordingly, BOR has not forfeited its immunity pursuant to the GTCA.  (Doc. 91, pp. 7–10.)

The GTCA defines a state officer or employee as "an officer or employee of the state . . . and persons acting on behalf or in service of the state in any official capacity, whether with or without compensation, but the term does not include an independent contractor doing business with the state."   O.C.G.A. § 50-21-22(7).   In <u>Williams v. Department of Corrections</u>, 481 S.E.2d 272 (Ga. Ct. App. 1997), the Georgia Court of Appeals observed that the 1991 version of the GTCA did not define the term "independent contractor," but "under the Code's general contract provisions, an independent contractor is one who 'exercises an independent business and . . . is not subject to the immediate direction and control of the employer.'"[8]  <u>Id.</u> at 275 (quoting O.C.G.A. § 51-2-4 (1997)).  "The chief test to be applied in determining whether a person is employed as a servant or as an independent contractor . . . [is] whether the contract gives, or the employer assumes,

---

[8]  While <u>Williams</u> was decided before the Code was amended in 1994, this definition remains the same in the current version of the Code.  <u>See</u> O.C.G.A. § 51-2-4.

the right to control the time, manner, and method of the performance of the work, as distinguished from the right merely to require certain definite results in conformity with the contract."  Id. (quoting Bowman v. C.L. McCord Land, etc., Dealer, 331 S.E.2d 882, 883 (Ga. Ct. App. 1985); see also Royal v. Ga. Farm Bureau Mut. Ins. Co., 777 S.E.2d 713, 715 (Ga. Ct. App. 2015).  The Georgia Court of Appeals has additionally outlined numerous factors to assist courts in determining whether an employer has the right to control the time, manner, and method of a physician's work.  See Harris v. City of Chattanooga, 507 F. Supp. 365, 367–73 (N.D. Ga. 1980) (canvassing dozens of Georgia appellate court decisions and articulating several factors which Georgia courts consider to make this determination). These factors include the employer's right to "direct the work step-by-step," to inspect the individual's work, to control their time, and the "method of payment."  Id. at 369–72.  These factors have been applied and elaborated upon in the hospital context.  See, e.g., Lee v. Satilla Health Servs., 470 S.E.2d 461, 462–63 (Ga. Ct. App. 1996); Cooper v. Binion, 598 S.E.2d 6, 9 (Ga. Ct. App. 2004). [9]

---

[9]  In 2005, the Georgia legislature enacted O.C.G.A. § 51-2-5.1(f), which provides that "[w]hether a health care professional is . . . an employee[] or an independent contractor shall be determined *by the language of the contract between the health care professional and the hospital*."  O.C.G.A. § 51-2-5.1(f) (emphasis added).  This "effectively superseded Lee and Cooper by allowing the language of the contract to control."  Pendley v. S. Reg'l Health Sys., Inc., 704 S.E.2d 198, 201 n.3 (Ga. Ct. App. 2010).  Section 51-2-5.1 also prohibited courts from considering some of the Lee and Cooper factors if there is no contract or the contract is unclear or ambiguous as to the relationship between the hospital and the doctor.  Id.; see O.C.G.A. § 51-2-5.1(g).  The Court has not been directed to evidence that the Prison's medical facility or GCHC is a "hospital," which Section 51-2-5.1(a)(2) defines to mean "a facility that has a valid permit or provisional permit issued by the Department of Community Health under Chapter 7 of Title 31."  Nothing that the Court has found in the extensive record indicates that either of them holds such a permit.  Accordingly, the Court cannot find on this record that the statute applies, and, therefore, concludes that it may rely upon Lee and Cooper when determining Wilson's employment status.  See Barney v. Peters, No. 4:20-173, 2022 WL 18673310, at *3 n.4 (S.D. Ga. Dec. 15, 2022).

Moreover, even if the statute were applicable, the record lacks a "contract between [Wilson] and the hospital" which would be controlling under Section 51-2-5.1(f).  O.C.G.A. § 51-2-5.1(f).  Consequently, this case would instead be governed by Section 51-2-5.1*(g)*, which essentially

It is undisputed that Wilson was assigned to work as a locum tenens physician at the Prison by Consilium, a staffing agency.  (Doc. 137-1, pp. 36–37; doc. 139-1, pp. 3–4.)  However, the precise nature of Wilson's assignment and her placement at the Prison are unclear from the record.  The Court does not have before it a contract for Consilium to supply locum tenens physicians to the Prison's hospital, a contract between Consilium and Wilson detailing the terms of Wilson's assignment to the Prison, or a contract between Wilson and the Prison (or any other entity involved in this case).  Nor have the parties supplied any other evidence concerning the agreements underlying Plaintiff's assignment that would allow the Court to evaluate the degree to which the manner, method, and means of Wilson's duties were controlled by one or more of these entities.  The Court therefore is left to consider whether there is sufficient other evidence for a reasonable jury to find that GCHC did—or, instead, to find that it did not—assume sufficient control over the time, method, and means of Wilson's work.

There is evidence that cuts against Wilson being an employee of GCHC and tends to suggest she was an independent contractor.  Awe testified that Wilson was an "agency doctor," "worked for the agency," and was "not an employee of GCHC."  (Doc. 119, p. 12.)  Gatewood testified that Wilson "was a contract provider [who] was [at the Prison] temporarily."  (Doc. 122, p. 50.)  Notably, Wilson herself testified that she "worked for," submitted her hours to, and was paid by Consilium, the staffing agency.  (Doc. 121, pp.

---

permits courts to consider whatever factors they deem relevant, except for a few prohibited factors outlined in paragraph (2).  See O.C.G.A. § 51-2-5.1(g) (providing that "[i]f the court finds that there is no contract or that the contract is unclear or ambiguous as to the relationship between the hospital and health care professional, the court shall apply" certain specific factors enumerated in paragraph (1) and "*factors not specifically excluded in paragraph (2)*") (emphases added).  The prohibited factors in paragraph (2) are not particularly relevant here and have not been considered, irrespective of Section 51-2-5.1.

75–76.)  "[T]he basis of the pay, i.e., whether the hospital paid the physician," is an important factor for the Court to consider, and payment by a third party is indicative of independent contractor status.  See Lee, 470 S.E.2d at 463.

On the other hand, the record could also support a finding that GCHC exercised considerable control over Plaintiff's assignments, schedule, and treatment decisions, all of which are factors cutting towards employee status.  Defendants concede that, as a locum tenens physician, Wilson was assigned to a specific work area by the Prison and, when she started, Awe (the Prison's medical director and a GCHC employee) told her that she needed to see fifteen patients a day.  (Doc. 137-1, pp. 38–39.)  In fact, although Wilson initially was only supposed to provide yearly physicals for inmates in the chronic care division, Awe informed her that her role was being expanded to include sick calls.  (Id. at p. 39.)  Awe also assigned Wilson additional duties in the infirmary, as well as on-call duties one day per week.  (Id. at p. 40.)  Wilson did not have the authority to refuse additional duties that Awe assigned to her.  (Id.); see Blackmon v. Tenet Healthsystem Spalding, Inc., 653 S.E.2d 333, 338 (Ga. Ct. App. 2007) (evidence that an employee "could not refuse an order to do 'such and such'" is indicative of employer-employee relationship), *vacated in part on other grounds*, 667 S.E.2d 348 (Ga. 2008).  Additionally, Wilson couldn't work whenever she wanted; someone at the Prison set her work hours and assigned her schedule. (Doc. 137-1, p. 39); see Cooper, 598 S.E.2d at 9 ("Where the hospital requires the physician to work certain hours or arranges the physician's schedule, this factor shows that the physician is an employee and may alone preclude summary judgment."); see id. (collecting cases).  Furthermore, Wilson reported to Awe, who reviewed everything she did and had to sign off on Wilson's referrals to outside providers and her notes.  (Doc. 137-1, pp. 39–

40); see Lee, 470 S.E.2d at 462 (noting that the right of the employer to inspect the employee's work is indicative of employee status). Indeed, Wilson testified that, if she believed someone needed to see an outside provider, she would discuss the situation with Awe, and he would make the "ultimate decision" about the referral before it was scheduled. (Doc. 121, pp. 21–22.)

In sum, the Court finds that there is a genuine dispute of fact as to Wilson's employment status. On this record, a reasonable jury could find that she was an "employee" of GCHC (and, therefore, BOR), or it could instead reasonably find that she was not an "employee." Consequently, the record could support a finding that BOR has waived its sovereign immunity from liability arising from Wilson's conduct, but it also could support a finding that BOR retains its sovereign immunity. Accordingly, summary judgment is not warranted in either party's favor on this issue, and it will be for the trier of fact to determine whether Wilson was an employee and thus whether the GTCA applies.

### C.     Whether Liability May be Imputed to GDC

GDC contends that it has sovereign immunity from Plaintiff's tort claims because neither Awe, nor Wilson, nor Hall were its "employees" under the GTCA. (Doc. 91, pp. 6–12.) Plaintiff does not argue that GDC directly employed these individuals; indeed, the Court has already found—per *Plaintiff's* request—that Awe and Hall were employees of BOR via their employment at GCHC, and, as discussed above, a factfinder must decide whether Wilson was an independent contractor or an employee of GCHC (and thus BOR). See Discussion Section I.B, supra. Plaintiff has not pointed to any evidence that any individual or representative of GDC exercised control over the method, means, or manner of Awe, Hall, or Wilson's work. Plaintiff instead contends (and requests summary

judgment on the basis) that these individuals were employees of GDC (as well as BOR) because GCHC is a "joint enterprise" of BOR and GDC.  (Doc.100-1, pp. 11–15.)  GDC responds that the GTCA "precludes liability of two state entities under a theory of joint enterprise," and, therefore, Plaintiff's claims against it must be dismissed.  (Doc. 147, p. 2.)

Even assuming (without deciding) that the employees of a "joint enterprise" between two contracting entities qualify as "employees" of both entities under the GTCA, Plaintiff has failed to show that GCHC was a "joint enterprise" of BOR and GDC.  Under Georgia law, a "joint enterprise" (more commonly referred to as a "joint venture") arises where "two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control (provided the arrangement does not establish a partnership), so as to render all joint venturers liable for the negligence of the other."  Kissun v. Humana, Inc., 479 S.E.2d 751, 752 (Ga. 1997); Fulcher's Point Pride Seafood, Inc. v. M/V "Theodora Maria", 752 F. Supp. 1068, 1072 (S.D. Ga. 1990).  "The mere existence of a business interdependency does not create a joint venture."  Lafontaine v. Alexander, 808 S.E.2d 50, 56 (Ga. Ct. App. 2017).  Rather, "[f]or a joint venture to exist, [t]here must be not only a joint interest in the purpose of the enterprise . . . but also an equal right, express or implied, to direct and control the conduct of one another in the activity causing the injury."  Williams v. Chick-fil-A, Inc., 617 S.E.2d 153, 155 (Ga. Ct. App. 2005) (internal quotation omitted).  Indeed, the Georgia Court of Appeals recently clarified that "mutual control is . . . an essential element to establishing joint venture liability among government entities."  Driskell v. Dougherty Cnty., 871 S.E.2d 283, 287 (Ga. Ct. App. 2022).

First, although there is some evidence in the record that GDC had some control over GCHC,[10] Plaintiff has not argued or cited to anything suggesting that GDC and BOR "combine[d] their property or labor, or both, in a joint undertaking *for profit*."  Kissun, 479 S.E.2d at 752 (emphasis added).  This Court has previously recognized that "sharing of profits and losses" is an important indicator of a joint venture relationship, and "[t]he absence of profit-sharing suggests the arrangement was not a joint venture."  Fulcher's Point Pride Seafood, 752 F. Supp. at 1072–73.  Nothing in the Interagency Agreement indicates that GCHC was intended to generate a profit.  To the contrary, the Interagency Agreement describes the parties' underlying intent as follows: "GDC desires to obtain appropriate health care services for prisoners of the State correctional system, consistently with the mission of its Office of Health Services to provide a constitutional level of care in an efficient and cost-effective manner," and "MCG desires to provide appropriate health care services for GDC prisoners in concert with the GDC Office of Health Services and under the general supervision of the GDC Director of Health Services."  (Doc. 117-3, p. 1.)  To effectuate these intentions, MCG "agree[d] to deliver comprehensive health care to all GDC prisoners," including, but not limited to, the services "more fully described" in the "Scope of Services" document incorporated into the Interagency Agreement.  (Id.)  That document similarly states that the Interagency Agreement is intended to accomplish GDC's medical mission of "provid[ing] the required constitutional level of health care to the

---

[10]  For example, GDC and BOR acknowledge that the "GDC Medical Director could review the work of any GCHC employee or contractor, . . . [and] recommend oral or written counseling, reduction in privileges, suspension, or separation to the GCHC Medical Director."  (Doc. 137-1, pp. 34–35.)  Furthermore, Lewis testified that GCHC's medical staff had to follow GDC's SOPs.  (Doc. 126, pp. 30–31.)  However, beyond following the SOPs, Lewis denied that "GDC controlled what providers actually did on a daily basis in the prisons."  (Id. at p. 30.)

inmates of the correctional system in the most efficient and effective manner possible." (Id. at p. 7.)  This cuts against finding that GCHC was a joint undertaking for profit, and consequently cuts against a finding of a joint enterprise.

Additionally, there is evidence that GDC and BOR intended to form a "partnership," which (while similar) is legally distinct from a "joint venture."  The Georgia Court of Appeals has reiterated that a joint venture arises "where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control, *provided the arrangement does not establish a partnership*."  Mullinax v. Pilgrim's Pride Corp., 840 S.E.2d 666 (Ga. Ct. App. 2020) (emphasis added).  Plaintiff explicitly argues that "GCHC is 'a partnership' between GDC and MCG."  (Doc. 137-1, p. 33.)  Indeed, as Plaintiff notes, the "Scope of Services" describes GCHC as a "*Partnership Between* [GDC/MDG]."  (Doc. 117-3, p. 6.)  Furthermore, the Interagency Agreement states that "a *partnership* is envisioned with each agency acting responsibly to carry out the necessary steps to achieve the goals" of the Interagency Agreement.  (Id. at p. 7 (emphasis added).)   While "[n]omenclature is not dispositive," the Interagency Agreement's explicit reference to GCHC as a "partnership," viewed in conjunction with the absence of any evidence GCHC was created to generate a profit, precludes a finding that GCHC was a "joint enterprise" of GDC and BOR.  Jerry Dickerson Presents, Inc. v. Concert S. Chastain Promotions, 579 S.E.2d 761, 768 (Ga. Ct. App. 2003).

In sum, after reviewing the evidence before it, the Court finds that Plaintiff has failed to carry his burden, at this stage of the proceedings, of presenting sufficient evidence to enable a reasonable jury to find that Hall, Wilson, and/or Awe were "employees" of GDC (either under a "joint enterprise" theory or otherwise) pursuant to the GTCA.  Thus,

24

the Court finds that GDC is entitled to sovereign immunity from Plaintiff's claims against it.  Accordingly, the Court **GRANTS** GDC's request for summary judgment on all claims against it, and **DISMISSES** GDC from this case.[11]

## II.  Plaintiff's Request for Summary Judgment on Issues Related to the Standard of Care, and Plaintiff's Related Motion to Exclude Experts (Doc. 100)

In Georgia, a medical professional owes a legal duty to exercise his or her profession with "a reasonable degree of care and skill."  O.C.G.A. § 51-1-27.  Accordingly, an essential element to a claim of medical malpractice is a determination that the defendant "breach[ed] . . . that duty by failing to exercise the requisite degree of skill and care."  Knight v. W. Paces Ferry Hosp., Inc., 585 S.E.2d 104, 105 (Ga. Ct. App. 2003).  The plaintiff must also show that the breach is "the proximate cause of the injury sustained."  Knight v. Roberts, 730 S.E.2d 78, 83 (Ga. Ct. App. 2012).  "The standard to be used to establish professional medical negligence under O.C.G.A. § 51-1-27 is that standard of care 'which, under similar conditions and like circumstances, is ordinarily employed by the medical profession generally."  Green v. United States, No. 1:19-cv-122, 2022 WL 966864, at *4 (S.D. Ga. Mar. 30, 2022) (quoting McDaniel v. Hendrix, 401 S.E.2d 260, 262 (Ga. 1991)).  "Expert testimony is required to establish . . . the standard of care . . . in a particular case."  Callaway v. O'Connell, 44 F. Supp. 3d 1316, 1326 (M.D. Ga. 2014)

---

[11] Plaintiff appeared to move for summary judgment on the issue of whether GCHC was a joint enterprise of Defendants GDC and BOR and, therefore, whether GDC is liable, pursuant to the GTCA, for the actions of Awe, Hall, and Wilson.  (Doc. 100, p. 1; doc. 100-1, pp. 11–12.)  For the reasons set forth herein, the Court finds that not only has Plaintiff not produced sufficient undisputed evidence to warrant judgment in his favor on this issue, but he has also not produced evidence from which a rational trier of fact could find in his favor even when viewing this issue in the light most favorable to him.  Accordingly, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment as to his contentions that GCHC was a joint enterprise of Defendants GDC and BOR and that, therefore, GDC could be held liable for the actions of Awe, Hall, and/or Wilson.

(citing <u>Kapsch v. Stowers</u>, 434 S.E.2d 539, 540 (Ga. Ct. App. 1993)).   Accordingly, "Plaintiff must present competent expert testimony that [Awe, Hall, and/or Wilson] breached the applicable standard of care and that this breach proximately caused [his injuries]."   <u>Smith v. Am. Transitional Hosps., Inc.</u>, 330 F. Supp. 2d 1358, 1361 (S.D. Ga. 2004).

Plaintiff requests summary judgment that GCHC violated the standard of care (1) "by failing to adequately monitor [Plaintiff's] [PVD] from 2018 through June 2019," (2) "when its employees failed to promptly refer [Plaintiff] to a vascular surgeon after he presented on or about April 25–26, . . . on May 3, . . . on May 16, . . . on May 30, . . . and on June 5, 2019," and (3) "when its employees ignored numerous nurse requests to re-examine [Plaintiff's] foot between his initial examination and the date on which [his] toe autoamputated." (Doc. 100-1, pp. 17–20.)  Plaintiff also asserts that the Court may consult, in addition to expert testimony, certain written standards/guidelines promulgated by GDC and other organizations to determine the applicable standard of care.  (<u>Id.</u> at pp. 15–17.) Additionally, Plaintiff has moved to exclude the opinions of Defendants' experts, Dr. Fowlkes and Dr. Horn, on the standard of care and causation, arguing that their methodology is not sufficiently reliable under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993).  (Doc. 100-1, pp. 20–22.)

###### A.      Plaintiff's Motion to Exclude Defendants' Experts' Standard of Care and Causation Opinions

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  The rule provides that

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Eleventh Circuit Court of Appeals has established a three-pronged inquiry encompassing these requirements to determine whether Rule 702 is satisfied. Under this inquiry, courts must evaluate whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citations omitted).  The proponent of the expert opinion bears the burden of establishing each of these elements by a preponderance of the evidence.  Id.

Plaintiff, here, is challenging Defendants' experts' opinions under the second prong enumerated by the Eleventh Circuit, contending that Defendants' experts' methodology was not "sufficiently reliable."  Frazier, 387 F.3d at 1260.  To assess the reliability of an expert's methodology, courts typically consider the following: (1) whether the theory or technique can be tested, (2) whether it "has been subjected to peer review and publication,"

(3) whether the technique has a "known or potential rate of error," and (4) whether the theory has attained "general acceptance" in the relevant community.  Id. at 593–94. However, "[t]hese factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important." Frazier, 387 F.3d at 1262. Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590.  In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  Fed. R. Evid. 702, advisory committee's notes to 2000 amendment.

Bearing in mind the diversity of expert testimony, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho, 526 U.S. at 152.  "[W]hether the proposed testimony is scientifically correct is not a consideration for this court, but only whether or not the expert's testimony, based on scientific principles and methodology, is reliable."  In re Chantix (Varenicline) Prods. Liab. Litig., 889 F. Supp. 2d 1272, 1280 (N.D. Ala. 2012) (citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999)).  "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Id. (alteration in original).

Plaintiff contends that Fowlkes and Horn's opinions regarding the standard of care and causation are unreliable because they are not "based on any nationally or professionally recognized clinical guidelines from disease-specific organizations or medical and physician associations."  (Doc. 100-1, p. 21.)  According to Plaintiff, their opinions,

28

instead, are based "entirely on [their] training, experience, and a review of [Plaintiff's] medical records," and neither expert explained how their prior experiences equip them to render these opinions.  (Id.)  Defendants do not dispute that Fowlkes and Horn relied primarily on their experience, training, and education to support their opinions, but they contend that the opinions are reliable because they were formed "by applying their extensive, relevant knowledge, training, and experience to the information reviewed in the medical records."  (Doc. 136, p. 14.)

While experts frequently base their opinions on professional research or literature, "[t]here is no inherent requirement that a medical expert cite or reference independent studies that support [his or] her conclusions."  Smith v. Bama Urgent Med., Inc., No. 7:08-CV-1546-RDP, 2011 WL 8635359, at *4 (N.D. Ala. July 20, 2011).   Additionally, "[n]either Daubert nor its progeny preclude experience-based testimony."  Colony Ins. Co. v. Coca-Cola Co., 239 F.R.D. 666, 674 (N.D. Ga. 2007) (citing Kumho, 526 U.S. at 151). Indeed, the advisory committee notes to the 2000 amendments to Rule 702 clarify that "an expert may be qualified on the basis of experience," and "experience alone—or experience in conjunction with other knowledge, skill, training or education—may . . . provide a sufficient foundation for expert testimony."  Fed. R. Evid. 702, advisory committee's notes to 2000 amendment.  Therefore, "[a] district court may decide that . . .  expert testimony is reliable based upon personal knowledge or experience."   Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) (internal quotations omitted).

However, "[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied

to the facts.'"  Frazier, 387 F.3d at 1261 (quoting Fed. R. Evid. 702, advisory committee's notes to 2000 amendment). "'Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough' to carry the proponent's burden."  Green, 2022 WL 966864, at *5 (quoting Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113 (11th Cir. 2005)); see also Frazier, 387 F.3d at 1261 ("If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.").  Accordingly, the Court must decide whether Fowlkes and Horn's respective training, experience, and education provide adequate support for their standard of care and causation opinions.

> **(1)   Defendants have failed to demonstrate the reliability of Fowlkes' challenged standard of care and causation opinions.**

Fowlkes' expert report concludes that (1) the medical care Plaintiff received from Awe and Hall from April 23 to June 13, 2019, was reasonable, appropriate, and well within the acceptable standard of care for a known PVD patient with chronic diabetic foot infections, and (2) "no action or alleged inaction by the defendants in this case caused the loss of [Plaintiff's] second toe or any other damages."  (Doc. 100-1, p. 55; see id. at pp. 52–57.)  His report states that his opinions are based upon his "training, experience, and a review of the records in this case."  (Id. at p. 52; see doc. 136-1, p. 93 (testifying that his opinions are "based on . . . the entirety of [his] training, experience, education, and keeping up with the literature generally, so [his] general knowledge").)

The curriculum vitae ("CV") attached to Fowlkes' report states that he is a "Certified Correctional Healthcare Professional" and a "Board certified emergency physician," and that he has served as the Medical Director at the Lafayette County (MS)

Detention Center since 1998.  (Doc. 100-1, p. 65.)  The majority of Fowlkes' current and prior experience listed in the CV pertains to addiction medicine, substance abuse treatment, and mental health services.  (See generally id. at pp. 65–66.)  In his report, Fowlkes failed to address how this training and experience informed his opinion that the care Plaintiff received was within the standard of care.  Fowlkes did not, for instance, detail how his employment as a medical director, drug court "medical consultant," and/or "outpatient provider of mental health services," led him to conclude that Plaintiff's "presentation should not have led a reasonable correctional primary care provider to suspect that [he] had a reversible stenosis, an ischemic limb, an endangered limb[,] or any other condition which required urgent referral to a vascular surgeon or any other action besides those which were being undertaken."  (Id. at pp. 55, 65.)

Notably, although Fowlkes repeatedly states that the medical care Plaintiff received and the specific treatment decisions made by Defendants were within the standard of care, he fails to ever specify what the standard of care actually is.  In addition to specifying how his or her experience has specifically led an expert to reach their conclusions, an expert must be able to articulate which standard of care they have employed.  See Smith, 330 F. Supp. 2d at 1361 (explaining the plaintiff's burden to provide expert testimony that the defendant breached the applicable standard of care "subsumes the burden of providing expert testimony as to what the applicable standard of care is").  Nowhere in Fowlkes' expert report did he describe the care that is "ordinarily employed by the medical profession generally" under circumstances similar to this case—namely, when a diabetic patient with PVD who has had prior amputations presents with a likely-infected wound on the same foot which had been partially amputated previously.  Indeed, when asked

questions such as from where specifically he gathered his supposed standard of care, Fowlkes could only offer the vague response that it "[was] his expert opinion . .   based upon [his] education, training and experience." (Doc. 136-1, p. 87.)  Additionally, when specifically asked what his basis was for opining that the standard of care did not require routine screening of people with a history of PVD, Fowlkes only responded, "Well, that would be on each individual circumstance." (Id. at p. 31.)  These responses underscore the conclusory nature of Fowlkes' standard of care opinions.  See Green, 2022 WL 966864, at *5 (finding an expert's standard of care opinions to be unreliable because they "appear[ed] almost entirely based on his varied, personal expertise in the field," and the expert "repeatedly decline[d] to offer a consistent standard of care, instead stating that the standard of care 'depends on the patient'"); see also Anderson v. Columbia Cnty., No. 1:12-cv-031, 2014 WL 8103792, at *11 (S.D. Ga. Mar. 31, 2014) (finding an expert's opinion that the standard of care was breached to be unreliable because the expert failed to "reference any specific experiences or materials upon which he relied in reaching his conclusion" and did not explain how his experience led to his conclusions); Dukes v. Ga., 428 F. Supp. 2d 1298, 1314–15 (N.D. Ga. 2006) (concluding that an expert's standard of care opinions were unreliable where he made "no reference to any specific experience or material upon which he relied in making his conclusions" and failed to specify what standard of care he was applying).

Fowlkes' causation opinions are equally unreliable.  Fowlkes never explained how his experience, training, or education supported his opinion that "no action or alleged inaction by the [D]efendants in this case caused the loss of [Plaintiff's] second toe or any other damages." (Doc. 100-1, p. 55.)  Furthermore, Fowlkes did not indicate that he

employed any particular scientific method to reach his causation opinion.  "Although no expert physician is required to employ . . . any . . . particular scientific method to arrive at their conclusion, their principles and methodology 'must be supported by appropriate validation,' so that the trial court does more than 'simply taking the expert's word for it.'" Magbegor v. Triplette, 212 F. Supp. 3d 1317, 1327 (N.D. Ga. 2016) (quoting Frazier, 387 F.3d at 1261).  Nothing in Fowlkes' report sufficiently validates his opinion that the course of treatment undertaken by Awe, Hall, or Wilson did not contribute to the autoamputation of Plaintiff's toe.  Fowlkes has offered no insight into how his experience guided his opinions, he references no specific method employed, and otherwise provides no independent support other than his personal opinion that Defendants did not cause Plaintiff's injury.

Defendants, as the proponents of Fowlkes' opinions, were required to provide a basis for the admission of those opinions.  Frazier, 387 F.3d at 1260.  Defendants have attempted to do so by simply referring to Fowlkes' experience.  However, "[a]ccepting [Dr. Fowlkes'] experience alone as evidence of the reliability of his statements is tantamount to disregarding entirely the reliability prong of the Daubert analysis."  Dukes, 428 F. Supp. 2d at 1315.  Rather than properly demonstrating the reliability of Fowlkes' expert opinions under Rule 702, Defendants essentially point to the *ipse dixit* of the expert.  Consequently, the Court **GRANTS** Plaintiff's Motion to exclude Fowlkes' opinion that Defendants met the standard of care as well as his opinion that Defendants did not cause Plaintiff's injuries. (Doc. 100-1, pp. 20–22.)

      **(2)**    **Defendants have failed to demonstrate the reliability of Horn's challenged standard of care opinions, but Defendants have shown the reliability of Horn's challenged causation opinions.**

In his expert report, Horn concluded that "the eventual amputation of [Plaintiff's] second toe was unavoidable," and "[e]ven with prompt medical care, immediate referral to [a] specialist, and aggressive wound care," amputation would still have been required.  (<u>Id.</u> at p. 29.)  Horn additionally concluded that "the standard of care was not breached" because even if Plaintiff had been "referred at the time of his initial presentation of his infected toe, his outcome would have been the same."  (<u>Id.</u> at pp. 29–30.)  Horn's report states only that his standard of care opinion is based on his "medical opinion," (<u>id.</u> at p. 29), and, during his deposition, he indicated that it was based on his "medical experience" and his belief that "another physician would [not] have acted any differently, given the circumstances," (doc. 136-2, p. 48).  The report indicates that he has ample relevant experience, stating that the "focus of [his] practice since 2005 is complex medical problems including complex peripheral wounds and limb threatening issues," that he works "closely with a vascular surgery group in the management of complex patients for limb salvage operations," and that he is on the staff at two local wound care centers.  (Doc. 100-1, p. 28.)

"[W]hile an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. . . . [Eleventh Circuit] caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony."  <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1341–42 (11th Cir. 2003).  As with Fowlkes, Defendants have failed to articulate "*how* [Horn's] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'"  <u>Evanston Ins. Co. v.</u>

<u>Xytex Tissue Servs., LLC</u>, 378 F. Supp. 3d 1267, 1279 (S.D. Ga. 2019) (emphasis added). Additionally, like Fowlkes, Horn did not articulate what the standard of care is for a patient like Plaintiff under the same or similar circumstances. Accordingly, the Court finds Defendants have failed to satisfy the reliability prong for Horn's opinions that Defendants did not violate the standard of care for the same reason the Court rejected Fowlkes' challenged standard of care opinion. <u>See</u> Discussion Section II.A.1, <u>supra</u>.

Notwithstanding the unreliability of Horn's standard of care opinion, his causation opinion—that eventual amputation of Plaintiff's toe was unavoidable and would have occurred regardless of the treatment he received—does not suffer the same flaw. Unlike his standard of care opinion, Horn applied his experience to the medical and administrative records to reach his conclusion:

> Upon reviewing the case of [Plaintiff], it is my conclusion that the eventual amputation of his second toe was unavoidable. [Plaintiff] has significant [PVD], and he can be defined as a vasculopath. . . . Even with prompt medical care, immediate referral to specialist, and aggressive wound care, the definitive treatment would still require an amputation of his second toe. . . .

> *In my experience*, once an acute infection occurs within a lower extremity digit, despite aggressive wound care, hyperbaric oxygen treatment, and evaluation by vascular surgery, a significant majority of patients end up with an amputation of the involved digit. In [Plaintiff's] case[,] even prompt recognition and early evaluation by a vascular surgeon would not have changed the outcome of having his second toe amputated. *Upon examination of his vascular studies*, he has significant microvascular disease throughout the dorsum of his foot as noted by monophasic Doppler signals present within his foot.

(Doc. 100-1, pp. 29–30 (emphases added).)   Accordingly, the Court rejects Plaintiff's contention that Horn's causation opinions should be excluded for inadequately explaining how his experience supported those opinions.[12]

In sum, based upon the forgoing, the Court **GRANTS** Plaintiff's Motion to Exclude Fowlkes' and Horn's opinions that Defendants did not violate the standard of care, and **GRANTS** Plaintiff's Motion to Exclude Fowlkes' opinion that Defendants did not cause Plaintiff's injuries.   However, the Court **DENIES** Plaintiff's Motion to Exclude Horn's causation opinion.

### B.   Sources to Consider When Determining the Standard of Care

Plaintiff asks the Court to find that the standard of care for his treatment should be determined not only by the testimony of his experts, Dr. Richard Hershberger and Dr. Robert Powers, but *also* by consulting the following written sources: GDC's SOPs, standards promulgated by the National Commission on Correctional Health Care ("NCCHC") and the American Correctional Association ("ACA"), and clinical guidelines of the Federal Bureau of Prisons ("FBOP").   (Doc. 100-1, pp. 15–17.)   Defendants respond that while SOPs and other written standards are guidelines to assist physicians, they do not, in and of themselves, establish the standard of care for physicians.   (Doc. 137, pp. 9–10.)

---

[12]  In his Reply in support of his Motion to Exclude, Plaintiff raises new arguments for why Horn's causation analysis is unreliable.   Issues raised for the first time in a reply brief are not properly before the Court where they could and should have been presented previously, Evans v. Berryhill, No. 3:15-cv-096, 2017 WL 989274, at *6 (S.D. Ga. Feb. 21, 2017), and it is well-established that the Court need not consider them, Kellner v. NCL (Bahamas), LTD., 753 F. App'x 662, 667 (11th Cir. 2018).   Accordingly, the Court need not address these arguments.   The Court is satisfied that Horn's ample experience "with the management of complex wounds" and "limb salvage operations," which Horn sufficiently connected to his causation opinions, provides a reliable basis for his opinion that Plaintiff's toe would have had to be amputated even if he had been referred to a vascular surgeon earlier.   (See doc. 100-1, p. 28.)

There is some Georgia case law suggesting that written standards are relevant to determining the standard of care in a particular case.  For example, in <u>Byrd v. Medical Center of Central Georgia, Inc.</u>, the Georgia Court of Appeals determined that a "service manual used by the surgical department of [the defendant medical center]" was "clearly relevant to the jury's determination of the standard of care to be applied in this case."  574 S.E.2d 326, 328–29 (Ga. Ct. App. 2002).  The court reasoned that the manual "established that the [defendant's] staff had recognized and adopted a guideline which strongly recommended" the type of care the plaintiff alleged should have been used.  <u>Id.</u> at 329. Likewise, in <u>Luckie v. Piggly-Wiggly Southern</u>, the court found that "any evidence as would conceivably be 'illustrative' of what might constitute the exercise of 'ordinary care' in the specific situation at issue, including private guidelines, is relevant and admissible for whatever consideration in that regard the jury wishes to give to it."  325 S.E.2d 844, 845 (Ga. Ct. App. 1984).  At least one of the Court's sister courts has also indicated that guidelines and other written materials are relevant to determining the standard of care.  <u>See, e.g.</u>, <u>Cook v. Royal Caribbean Cruises, Ltd.</u>, No. 11–20723, 2012 WL 1792628, at *3 (S.D. Fla. May 15, 2012) ("[A]dvisory guidelines and recommendations, while not conclusive, are admissible as bearing on the standard of care in determining negligence.").

However, to the extent Plaintiff is arguing that these written materials *are* the standard of care, the Court disagrees.  "Georgia law requires evidence of compliance with the standards of the medical profession generally and not compliance with local standards." <u>Summerour v. Saint Joseph's Infirmary</u>, 286 S.E.2d 508, 508 (1981).  The Court has previously stated that the standard of care in medical malpractice cases in Georgia is not "measured by a particular facility's policies and procedures."  <u>Smith</u>, 330 F. Supp. 2d at

1361; see also Bayse v. Dozier, No. 5:18-CV-00049-TES-CHW, 2019 WL 2550321, at *2 (M.D. Ga. June 20, 2019) ("To the extent Plaintiff argues that the [the standards published by the World Professional Association for Transgender Health] *are* the standards to be applied to the evaluation and treatment of transgender inmates, and when not utilized, those inmates are not receiving proper treatment, such argument is misplaced.").

Additionally, the materials themselves and other evidence in the record negate the idea that the sources provide *the* standard of care applicable to Plaintiff in this case.  With respect to GDC's SOPS, SOP 507.01.01 states that "[i]t is the intent of the . . . GDC . . . to deliver health care to inmates/probationers in a manner that *meets contemporary standards in the community.*"  (Doc. 117-13, p. 2 (emphasis added).)   SOP 507.04.11 similarly indicates that the assessment of the need for an outside referral must consider whether "[r]epair or treatment of the problem is . . . consistent with *community standard of care.*" (Doc. 117-6, pp. 2–3 (emphasis added).)  Jack Sauls, the Assistant Commissioner for GDC's Office of Health Services, also testified that "[t]he current standard of care and the community standard of care that may exist *out in the community*" are "applied to any considerations for SOP modifications, changes[,] or application of new policies."  (Doc. 125, pp. 10–11 (emphasis added).)  Viewed collectively, this evidence suggests that the standard of care is separate from the SOPs themselves.  Moreover, none of the SOPs contained in the record deal with treating diabetic infections/ulcers, vascular issues, or even wound care in general.

Furthermore, although there is evidence that GCHC's employees were required to comply with NCCHC and ACA standards, the portions of these standards contained in the record fail, for various reasons, to supply a definitive standard of care.  The only ACA

record is a document titled "Standards and Expected Practices of Adult Correctional Institutions" that is dated *March 2021*—nearly two years *after* the events giving rise to this case took place.  (Doc. 117-10, p. 1.)  In addition, the version contained in the record consists merely of a table of contents and lists the criteria for a "plan for the treatment of offenders with chronic conditions such as . . . diabetes."  (Id. at p. 18; see generally doc. 117-10.)  With respect to the NCCHC standards, Plaintiff submits "Standards for Health Services in Prisons" from 2018.  (Doc. 117-9.)  Notably, this document does *not* state that it provides any "standard of care."  (See generally id.)  To the contrary, it states that the standards therein "represent the official *position* of the [NCCHC] with respect to requirements for health services in prisons," and acknowledges that the standards "do not necessarily represent the official position of NCCHC supporting organizations or individuals serving on the NCCHC Board of Directors."  (Id. at p. 2 (emphasis added).)  This description cuts against a finding that this document provides the standard "ordinarily employed by the medical profession generally."   McDaniel, 401 S.E.2d at 262.  Additionally, the document Plaintiff submitted is predominantly a table of contents.  The only substantive portion is a section titled, "P-F-01 . . . Patients with Chronic Disease and Other Special Needs." (Doc. 117-9, p. 7.)  This section vaguely states that the "[s]tandard" for patients with chronic diseases is to "receive ongoing multidisciplinary care aligned with evidence-based standards," encourages the development of a "treatment plan," and recommends "regular clinic visits for evaluation and management" for chronic disease patients.  (Id. at pp. 7–9.)  This is far too general to be the standard of care in this case.

Finally, Plaintiff submitted the FBOP's March 2014 guideline for the "Prevention and Management of Acute and Chronic Wounds."  (Doc. 117-12.)  On the first page, the

FBOP's guidelines caution that they are "made available to the public for informational purposes only" and that "*[p]roper medical practice necessitates that all cases are evaluated on an individual basis and that treatment decisions are patient-specific.*"  (Id. at p. 1.)  Additionally, the document states that the "purpose" of the guidelines is to "provide[] *guidance* on the prevention and treatment of common types of wounds."  (Id. at p. 5 (emphasis added).)  To fulfill this purpose, the document supplies a "Basic Supportive Wound Care Algorithm," which consists of a multi-step framework for treating a patient who presents with a wound, completing an "initial wound assessment," and developing a treatment plan by evaluating the wound bed.  (See id. at p. 6.)  Such a fact-dependent framework, while perhaps relevant to the jury's determination of the standard of care in this case, does not conclusively establish the standard of care here.  See Smith, 2012 WL 13088764, at *7 ("[A]n unwarranted logical leap is required to reach to the conclusion that recommendations made in [an organization's guideline's] are actually the *standard of care* for any particular type of medical practice.").

### C.   Plaintiff's Request for Summary Judgment that Certain Acts or Omissions Violated the Standard of Care

#### (1)   The Alleged Failure to Monitor Plaintiff's PVD from 2018 through 2019

Plaintiff asks the Court to find that Defendants violated the standard of care by failing to adequately monitor his PVD from 2018 through 2019.  (Doc. 100-1, pp. 17–18.) Specifically, Plaintiff contends that it was a violation of the standard of care not to have been scheduled for an arterial duplex follow-up in 2018 or to have received an ankle brachial index (ABI) between his 2017 surgeries and his 2019 amputation.  (Id. at p. 18.)

Plaintiff's original Complaint (the allegations of which are incorporated into the Amended Complaint) alleges that the first incident that is the subject of this action occurred on April 23, 2019, when Plaintiff saw Awe in the infirmary for an abrasion on the top of his second toe. (Doc. 1, p. 38.) Furthermore, the Complaint only alleges that the standard of care was breached because Plaintiff was not promptly referred to a board-certified vascular surgeon for evaluation at any point after he presented at the infirmary that day, (doc. 1, pp. 41–43); the Complaint is devoid of any mention of an arterial duplex or ABI, much less allegations that the failure to schedule or perform one or both of these tests constituted a breach of the standard of care. (See generally id. at pp. 30–45). Moreover, Plaintiff does not seek damages for events that occurred before April 23, 2019. (Doc. 148, p. 3; see doc. 1, pp. 114–116 (providing ante litem notice for torts allegedly committed between "April 23, 2019–June 13, 2019").) Accordingly, the Court declines to address whether it was a violation of the standard of care for Plaintiff not to have received an arterial duplex or ABI or, more generally, whether any act or omission alleged to have occurred prior to April 23, 2019, violated the standard of care and Plaintiff's request for summary judgment in his favor on this topic is **DENIED**.

### (2)   Failure to Refer Plaintiff to a Vascular Surgeon or Specialist

Plaintiff contends that Defendants violated the standard of care because they did not promptly refer Plaintiff to a vascular surgeon after he presented on or about the following dates in 2019: April 25–26; May 3; May 16; May 30; and June 5. (Doc. 100-1, p. 19.) Plaintiff largely relies on Hershberger's expert opinion that "[t]he standard of care for any patient with severe [PVD] who develops wounds and cellulitis to the foot is prompt referral to a board-certified vascular surgeon for evaluation." (Id. (quoting doc. 60, p. 5).)

Plaintiff also cites FBOP guidance which, he contends, "clearly indicates that when a patient with arterial insufficiency or neuropathic disease . . . presents with 'cellulitis, abscess, gangrene, or deep ulceration,' this is a 'potential life or limb threatening issue' for which the provider must 'consider immediate referral for treatment and amputation prevention.'"  (Id. (quoting doc. 117-12, p. 8).)

With respect to Hershberger's opinion, Defendants do not challenge its reliability, and, indeed, the Court finds that his statements are reliable under Daubert.  Because the Court has excluded the standard of care opinions of Defendants' experts, see Discussion Section II.A., supra, Hershberger's opinions that the standard of care was violated by not referring Plaintiff to a vascular specialist are unopposed.   However, "[e]ven in an unopposed motion, . . . the movant is not absolve[d] . . . of the burden of showing that [he] is entitled to a judgment as a matter of law," and the Court "must still review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009) (alterations in original). To that end, the Court must "consider the merits of the motion" and "review all of the evidentiary materials submitted in support of the motion," United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., 363 F.3d 1099, 1101–02 (11th Cir. 2004), in order to "satisfy itself that the [movant's] burden has been satisfactorily discharged," Reese v. Herbert, 527 F.3d 1253,1268 (11th Cir. 2008).

Hershberger's opinions regarding the standard of care are based upon and assume that Plaintiff had an "ischemic digit" and/or Chronic Limb-Threatening Ischemia ("CLTI") when he first presented to the nurse on April 23, 2019.[13]  (See generally doc. 92-5.)  For

---

[13]  Merriam-Webster's Medical Dictionary defines "ischemia" as a "deficient supply of blood to a body part (as the heart or brain) that is due to obstruction of the inflow of arterial blood." Ischemia,

example, Hershberger's Amended Expert Report provides that his "overall opinion in this matter is that [GDC] failed to recognize critical limb ischemia in [Plaintiff]." (Id. at p. 2.) Elsewhere in his report, Hershberger opines that Plaintiff's "toe ulcer was not healing because of lack of arterial flow to his foot" and that, "with the occlusion of [Plaintiff's] stents due to his multiple medical problems, [Plaintiff] was placed back into a limb threatening situation with CLTI." (Id. at pp. 13, 5.) Hershberger further states that "[Plaintiff] had a return of his CLTI as he had a history of stenting that healed ulcerations to his foot," and his wound was "perpetuated by arterial insufficiency." (Id. at pp. 10, 13.) Hershberger proceeds to frame his standard of care opinions according to these assumptions. For instance, he states that the "[s]tandard of care for treatment of an *ischemic digit* is urgent referral to a vascular specialist for revascularization," and that Plaintiff's amputation would not have been necessary "if the *ischemic* nature of his left second toe had been recognized on April 23, 2019." (Id. at p. 2 (emphasis added).) Similarly, he opined, "[u]rgent referral to a vascular specialist in an individual with *ischemic changes* to the foot is standard of care," and, "*[a]s [Plaintiff] was placed back into CLTI*, a referral to a board-certified vascular surgeon was mandatory." (Id. at pp. 5–6 (emphasis added).)

There is a genuine dispute of fact as to whether Plaintiff's toe was ischemic or whether his CLTI had returned when he presented to Gatewood on April 23, to Awe on April 25 or 26, and to Wilson on May 3 and May 16. It is undisputed that, after Plaintiff's 2017 amputations, he underwent surgery to have several stents placed into the arteries in

---

Merriam-Webster's Medical Dictionary, https://www.merriam-webster.com/dictionary/ischemia#medicalDictionary. Dr. Hershberger defined CLTI as "ulceration to the foot caused by a lack of blood flow." (Doc. 60, p. 5.)

his left leg because his left superficial femoral artery was occluded.  (Doc. 137-1, p. 7.)  Hershberger explicitly acknowledged that the stents placed in Plaintiff's leg in 2017 "allowed him to heal his wounds and removed him from a limb threatening situation." (Doc. 92-5, p. 6; <u>see</u> doc. 119, p. 63 (Awe's testimony that contrast studies subsequent to Plaintiff's revascularization procedure "show[ed] his stents [were] patent several months after he was discharged by the specialist")).)  Yet, Hershberger nonetheless determined that Plaintiff's stents occluded, precipitating the return of Plaintiff's arterial flow issues and preventing his toe from healing.  Hershberger based his determination on the fact that Plaintiff had palpable pedal pulses following revascularization procedures performed subsequent to the amputation of his left second toe.  (Doc. 92-5, pp. 5, 12–13.)  However, there is ample evidence that Plaintiff had palpable pedal pulses when he presented to nurse Gatewood for a sick call on April 23, when he saw Awe on April 25 or 26, and when he saw Wilson on May 3 and May 16.  There are two areas to check pulses on a foot—the "dorsalis pedis pulse" and the "posterior tibialis pulse."  (Doc. 119, p. 28; doc. 117-12, p. 13; doc. 121, p. 32.)  The record from Plaintiff's appointment with Gatewood explicitly states that "pedal pulses [were] present," (doc. 108-1, p. 31), and Gatewood confirmed that she palpated for *both* pulses on April 23, (doc. 122, p. 23).  Gatewood also testified that she was trained to palpate for pulses in the feet, and that the purpose of doing so was to ensure blood was flowing to Plaintiff's foot.  (<u>Id.</u> at p. 24.)  Awe similarly testified that he took Plaintiff's dorsalis pedis and posterior tibialis pulses and that, at that time, they were "good."  (Doc. 119, pp. 26, 28.)  Wilson testified that she checked both pulses, Plaintiff had "palpable peripheral pulses," and "there was no indication, from the two times that [she] saw him . . ., that . . . his pulses were absent."  (Doc. 121, pp. 32–33.)

The record also contains evidence from which a jury could find that, as of May 16, Plaintiff's wound presentation was inconsistent with that of a patient who was suffering from an occluded artery or arterial insufficiency.  The FBOP guidelines Plaintiff relies upon provide that, in addition to palpating pulses, a basic vascular exam of a lower extremity includes assessing skin coloration/appearance, palpation of skin temperature, and capillary refill.  (See doc. 117-12, p. 13.)   The guidelines further state that the wound beds for "arterial insufficiency wounds" are usually covered with "dry necrotic tissue." (Id. at p. 29.)  Wilson testified that when she saw Plaintiff, the skin was "warm to touch," his "capillary refill was normal," and there was "no necrosis."  (Doc. 121, p. 70.)  Wilson distilled from these observations that "[t]here was no indication that . . . [she] needed to refer [Plaintiff] urgently to a vascular surgeon."  (Id.)  Awe similarly testified that, based on his clinical exam, Plaintiff lacked "any evidence of gangrene on his foot," and, instead, had "redness" and "increased warmth."  (Doc. 119, p. 51.)  According to Awe, these findings were inconsistent with "an occluded artery," in part, because "if his artery was occluded on that day . . . it wouldn't have any pulse[,] and his foot probably would look black."  (Id. at pp. 51–52.)  In fact, Awe went as far as to say he knows "for a fact that [Plaintiff] didn't have [an] occluded SFA based on the clinical exam on April 23."  (Id. at p. 51.)  Finally, Fowlkes testified that he does not believe that Plaintiff "had signs and symptoms of . . . critical limb ischemia that should have been identifiable to any of the[] providers on the day they saw him."  (Doc. 136-1, p. 1.)

A reasonable jury could credit the forgoing testimony and evidence and conclude that Awe and Wilson did not violate the standard of care by failing to refer Plaintiff to a vascular specialist on April 25/26, May 3, or May 16.  Simply put, the evidence, construed

in Defendants' favor, cuts against a finding that Plaintiff's stents were occluded and that his arterial flow was compromised such that the standard of care (as articulated by Hershberger) required an immediate referral to a vascular specialist.

Plaintiff has a stronger argument for summary judgment on the issue of whether, *as of May 29*, the evidence establishes that the condition of Plaintiff's toe had deteriorated to the point that the standard of care required prompt referral to a vascular specialist.  May 29 is the date Plaintiff was seen by Hanzel at the wound care clinic.  (Doc. 137-1, p. 21.)  Hanzel noted that Plaintiff's left foot had no palpable pulse and that a doppler test indicated he had a "weak" dorsalis pedis pulse and "no" post-tibialis pulse.  (Doc. 119-2, p. 12.)  Hanzel listed one of Plaintiff's "active problems" as "atherosclerosis of native arteries of extremities, bilateral legs."  (Id. at pp. 17–18.)  Hanzel also stated that Plaintiff's wound was worsening due to "poor circulation."  (Id. at p. 15.)  Hanzel concluded by stating that he "would like to get vascular eval[uation] and angio[gram] results from [Plaintiff's] last hospitalization" and that Plaintiff "surely will need another vascular eval[uation] as [Hanzel] suspect[ed] [Plaintiff] may not have adequate circulation to heal [his] toe ulcer." (Id. at p. 18.)

Hall testified that she examined Plaintiff's toe on June 5, when she saw him for a follow-up to his wound care visit.  (See doc. 120, pp. 22, 30–31.)  It is undisputed that she knew Plaintiff had PVD and had prior amputations at that time.  (See doc. 108-1, p. 15; see also doc. 120, pp. 31–32.)  Additionally, she admitted that "the records from the wound care clinic had been obtained and were on [Plaintiff's] chart," and that she signed and reviewed them.  (Doc. 92-4, p. 5.)  It is also uncontroverted that Plaintiff told Hall that the wound care clinic instructed him to follow-up with "vascular" to have an amputation, and

that Hall instructed Plaintiff to ask the clinic about a referral to a vascular specialist on his follow-up (which was scheduled for two weeks later). (Id.; doc. 108-1, p. 15.) Finally, Hall, as a P.A., could make a referral to an outside medical provider. (Doc. 137-1, p. 28; see doc. 126, p. 78.) The forgoing evidence, most notably the fact that Hall reviewed Hanzel's records describing Plaintiff's circulatory issues and absent/weak pulses, compels the conclusion that Hall was on notice that Plaintiff's PVD had returned and his ischemia/arterial insufficiency most likely was contributing to the deterioration of his wound. Consequently, if a jury accepts Hershberger's opinions regarding the standard of care, it appears it would find that the standard of care required Hall to recommend Plaintiff to a vascular specialist or surgeon on June 5, and that she breached that standard where, instead of doing so, she ordered *Plaintiff* to ask about such a referral two weeks later at his follow-up appointment. (See doc. 92-5, p. 1 (opining that the "[s]tandard of care for treatment of an ischemic digit is urgent referral to a vascular specialist for revascularization").)

However, the Court must keep in mind that Plaintiff bears the burden of proof on this claim and, therefore, he cannot simply point to a lack of expert evidence from Defendant. As explained by the Middle District of Georgia,

> "If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." Anthony v. Anthony, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing [United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991)]). The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." Four Parcels of Real Prop., 941 F.2d at 1438. In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. Id.

Jackson v. Heath, No. 5:19-CV-132 (MTT), 2020 WL 5647823, at *1 (M.D. Ga. Sept. 22, 2020). The Court recognizes that only a qualified expert may testify as to whether a medical professional breached the standard of care. The Court also recognizes that, given the Court's above rulings, Plaintiff has the only expert evidence as to whether Hall complied with the standard of care. However, "[e]ven uncontradicted expert opinion testimony is not conclusive, and the jury has every right not to accept it." Gregg v. U.S. Indus., Inc., 887 F.2d 1462, 1470 (11th Cir. 1989) (citing Remington Arms Co., Inc. v. Wilkins, 387 F.2d 48, 54 (5th Cir. 1967)). Consequently, Hershberger's opinions are not so credible that they would entitle Plaintiff to a directed verdict. In a similar situation, the District Court for Montana denied a plaintiff's motion for partial summary judgment and rejected "the proposition that the conclusions an expert reaches after opining on the standard of care are, as a matter of law, indisputable if [d]efendants have not offered a contrary opinion as to the standard of care." Reiner v. Warren Resort Hotels, Inc., No. CV 06-173-M-DWM, 2008 WL 5120682, at *2 (D. Mont. Oct. 1, 2008). The Court explained that, as the party bearing the burden of proof, the plaintiff had merely "made a prima facie case—met her burden of production—of negligence. It is for the trier of fact, not the Court, to determine whether she meets her burden of persuasion." Id. at *2; see also Slocum v. Int'l Paper Co., No. CV 16-12563, 2021 WL 4169416, at *2 (E.D. La. Sept. 14, 2021) (rejecting plaintiffs' arguments that they were entitled to summary judgment due to defendant's failure to offer expert to refute their allegations of negligence, explaining that "[p]laintiffs are both the movants and the party that bears [the] burden of proof at trial," and, "[p]ut differently, summary judgment as to [p]laintiff[s'] negligence claims is not warranted simply because [p]laintiffs have offered expert opinion testimony in support of

[defendant's] liability and [defendant] has not"); <u>In re Engle Progeny Cases</u>, No. 309-CV-10000-WGJ-JBT, 2015 WL 12839192, at *2 (M.D. Fla. Jan. 13, 2015) (denying plaintiff's motion for judgment as a matter of law on issue of whether plaintiff was addicted to nicotine because plaintiff "bore the burden of proof, [and, therefore,] the jury was free to 'disregard all evidence favorable to [plaintiff] that [it was] not required to believe,'" and "'[e]ven uncontradicted expert opinion testimony is not conclusive'" and, as such, "jury was not required to accept [expert's] uncontroverted opinion that [plaintiff] was addicted to nicotine") (quoting <u>Akouri v. State of Fla. Dep't of Transp.</u>, 408 F.3d 1338, 1343 (11th Cir. 2005) and <u>Gregg</u>, 887 F.2d at 1470).  Consequently, even in light of Plaintiff's uncontroverted expert opinion evidence, the question of whether Hall breached the standard of care should remain in the jury's hands.

Accordingly, the Court **DENIES** Plaintiff's request for summary judgment on the issue of whether Hall, Awe, and Wilson breached the standard of care by not referring Plaintiff to a vascular surgeon or specialist at an earlier date.

### (3)    Ignoring Requests to Re-Examine Plaintiff's Toe Between His Initial Exam and the Date His Toe Was Autoamputated

Plaintiff alleges that Defendants "violated standard of care when [they] ignored numerous nurse requests to re-examine [his] foot between his initial examination and the date on which [his] toe autoamputated."  (Doc. 100-1, pp. 19–20.)  For support, Plaintiff points to Awe's testimony that the nurses performing Plaintiff's daily bandage changes would have asked one of the providers to see Plaintiff if they observed his wound getting worse.  (<u>Id.</u> at p. 19 (quoting doc. 119, p. 73).)  According to Plaintiff, "[a]t least two nurses did this more than once because they were concerned about [Plaintiff's] toe, yet neither Awe nor any other ALP bothered to re-examine [Plaintiff's] toe between May 17th and

June 7th." (Doc. 100-1, p. 20.) This, Plaintiff contends, "clearly falls short of the 'reasonable degree of care' required by O.C.G.A. § 51-1-27." (Id.)

As a preliminary matter, Plaintiff has not cited any expert testimony establishing that a physician violates the standard of care by not following up on a nurse's request to re-examine a patient. (See id. at pp. 19–20.) However, even if Plaintiff had done so, there is a genuine dispute of fact that precludes summary judgment on this issue. Plaintiff cites his own testimony and the testimony of nurses Gatewood, Parker, and Amber Anderson to show that Gatewood and Anderson complained to a provider that Plaintiff's toe was worsening. (Doc. 100-1, p. 20 (citing doc. 137-1, p. 20).) Parker testified that in May or June of 2019, Gatewood told her that she had complained to Awe about Plaintiff's toe. (Doc. 123, pp. 43–45.) However, Gatewood herself testified that she did not recall telling Parker that she was concerned with Plaintiff's toe and could not say with certainty whether she voiced similar concerns to an ALP. (Doc. 122, pp. 38–39.) Thus, a reasonable juror could find that Gatewood did not request Awe to examine Plaintiff.

Furthermore, although nurse Amber Anderson testified that she "complained several times to [ALPs] . . . at [the Prison] about [Plaintiff's] toe," she did not specify *which* ALPs she complained to. (Doc. 117-2, p. 2.) The Court, therefore, cannot determine, based on this testimony alone, whether Anderson complained to Awe or Hall, or instead to some other ALP at the Prison (who may not have even been a GCHC employee). Finally, despite Plaintiff's claim to the contrary, there *is* evidence that Plaintiff's foot was examined by an ALP between May 17 and June 7. Specifically, Hall testified that she examined Plaintiff's

toe on June 5, and the medical encounter form from this date corroborates her testimony.[14]

(Doc. 120, pp. 22, 24–25; doc. 108-1, p. 15.)

Based on the forgoing, the Court **DENIES** Plaintiff's Motion for Summary Judgment on his claim that Defendants violated the standard of care when they ignored numerous nurse requests to re-examine his foot between his initial examination and the date on which his toe autoamputated.

### III.  Hall's Motion for Summary Judgment as to Plaintiff's Deliberate Indifference Claim Against Her (Doc. 92)

Hall contends that summary judgment is appropriate as to Plaintiff's Section 1983 claim against her because the evidence in the record satisfies neither the objective nor the subjective components necessary to prevail on a claim for deliberate indifference to medical needs.  (Doc. 92-2, pp. 9–15.)  According to Hall, this case amounts to a dispute over the proper course of treatment which does not amount to deliberate indifference.  (Id. at pp. 15–17.)  Alternatively, Hall contends that she is entitled to qualified immunity.  (Id. at pp. 17–19.)

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' [that is] proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (internal citation omitted).  "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry."  Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).  "First, the plaintiff must prove an objectively serious medical need.

---

[14]  In Hall's Response to Plaintiff's first set of interrogatories, she stated under penalty of perjury that physician's assistants such as herself are ALPs.  (Doc. 138-3, p. 4; see id. at p. 8 (signed verification of Hall's responses).)

Second, the plaintiff must prove that the prison official acted with deliberate indifference to that need." Id. (internal citation omitted). In light of disputes between the parties concerning the proper applicable standard as well as recent guidance from the Eleventh Circuit, the Court will address each of these components in detail.

### A.     Objective Component (Serious Medical Need)

Hall concedes that Plaintiff had an objectively serious medical need when he presented to her on May 30 and June 5, 2019. (Doc. 146, p. 3.) Additionally, there is support in this circuit for finding that Plaintiff's condition was an objectively serious medical need. See, e.g., Milton v. Turner, 445 F. App'x 159, 163 (11th Cir. 2011) (holding that for a diabetic, an infected toe, which was worsening and potentially risked amputation, presented a serious medical need); Walsh v. Jeff Davis Cnty., No. 2:10-cv-075, 2012 WL 12952564, at *7 (S.D. Ga. Mar. 29, 2012), ("[I]t is beyond question that reduced blood flow in a diabetic which is severe enough to cause a leg amputation is a serious medical need."), aff'd, 489 F. App'x 389 (11th Cir. 2012). Thus, according to Plaintiff, because he suffered from an objectively serious medical need, he has satisfied the objective component of his claim. There is support in this circuit for this conclusion. See Hayes v. Lewis, No. 6:16-cv-20, 2017 WL 104176, at *3 (S.D. Ga. Jan. 10, 2017), ("Plaintiff has shown that he has a serious medical need and has, therefore, satisfied the objective component of his deliberate indifference claim."), report and recommendation adopted sub nom. Hayes v. Toole, No. 6:16-CV-20, 2017 WL 898000 (S.D. Ga. Mar. 7, 2017); Dunn v. Hart, No. 5:13-cv-131, 2016 WL 5661058, at *4 (S.D. Ga. Sept. 29, 2016) ("The parties do not dispute that Plaintiff had a serious medical need following his attack and, therefore, agree that Plaintiff has satisfied the objective component of his deliberate indifference claim.").

Notwithstanding, Hall maintains that summary judgment in her favor is warranted on the objective component. According to Hall, showing an objectively serious medical need is just the first prong necessary to satisfy the objective component, and the second prong requires showing that the public official's response to the plaintiff's serious medical need was "poor enough to constitute an unnecessary and wanton infliction of pain." (Doc. 92-2, p. 10 (quoting Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000)); doc. 146, p. 2 (same).) Plaintiff responds that "proving the 'unnecessary and wanton infliction of pain' is part of the subjective (deliberate indifference) prong, not the objective (serious medical need) prong." (Doc. 138, p. 13 n.15.)

The Eleventh Circuit's articulation of the objective component of deliberate indifference to serious medical needs claims has been somewhat inconsistent. Although Taylor and a handful of subsequent Eleventh Circuit cases (all of which cite Taylor) have included the "unnecessary and wanton" prong, see, e.g., Evans v. St. Lucie Cnty. Jail, 448 F. App'x 971, 974 (11th Cir. 2011); Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011), in the vast majority of cases, the court has framed the objective component as merely requiring the plaintiff to show that he or she had an objectively serious medical need. See, e.g., Wright v. Sprayberry, 817 F. App'x 725, 730 (11th Cir. 2020) ("The objective inquiry requires that the prisoner show an objectively serious medical need.") (internal quotation omitted); Brennan v. Comm'r, Ala. Dep't of Corr., 626 F. App'x 939, 941 (11th Cir. 2015) ("To establish a claim of deliberate indifference under 42 U.S.C. § 1983, a plaintiff must satisfy an objective component by showing that he had a serious medical need.") (citing Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007)). This is the standard that the Eleventh Circuit has applied recently. See, e.g., Wade v. McDade, 67 F.4th 1363, 1370

(11th Cir. 2023) (stating that a "plaintiff-inmate must establish an objectively serious medical need" to satisfy the objective component and finding that "an unmedicated seizure disorder satisfies that objective threshold") (internal quotations omitted); Myrick v. Fulton Cnty., 69 F.4th 1277, 1305 (11th Cir. 2023) (noting that satisfying the objective component required a showing that the plaintiff "had an objectively serious medical need").  Indeed, this Court's recent decisions have followed suit, focusing the objective inquiry on the existence of a serious medical need and not requiring (or even mentioning) the need to show a wanton infliction of pain.  See, e.g., Bayse v. Philbin, No. 1:22-cv-024, 2023 WL 2950633, at *7 (S.D. Ga. Feb. 23, 2023) ("To state a claim for deliberate indifference to serious medical needs, Plaintiff must allege: (1) a serious medical need—*the objective component*, (2) a defendant acted with deliberate indifference to that need—*the subjective component*, and (3) injury caused by a defendant's wrongful conduct.") (emphasis added), *report and recommendation adopted*, No. 1:22-cv-024, 2023 WL 2730664 (S.D. Ga. Mar. 31, 2023).

Accordingly, the Court follows the weight of authority in this Circuit and finds that, because Hall has conceded that Plaintiff had a serious medical need, the objective component is apparently satisfied, and summary judgment is not warranted in Hall's favor on this specific issue.  See James v. Am. Int'l Recovery, Inc., 799 F. Supp. 1156, 1166 (N.D. Ga. 1992) ("The rule within the Eleventh Circuit is that in the event there is an intra-circuit conflict on a given issue, the district court is required to follow Supreme Court authority or the weight of authority within the circuit.") (collecting cases) (internal quotation omitted). Thus, the Court **DENIES** this portion of Hall's Motion for Summary Judgment.

### B.      Subjective Component (Deliberate Indifference)

Earlier this year, in <u>Wade v. McDade</u>, the Eleventh Circuit clarified the standard for meeting the subjective component.  67 F.4th at 1370–74.  Prior to this ruling, the precise level of negligence necessary to satisfy the subjective component in a deliberate indifference claim was unclear.  As the Court noted:

> A deliberate-indifference claim's subjective component entails three subparts: The plaintiff must prove that the defendant (1) actually knew about a risk of serious harm; (2) disregarded that risk; and (3) acted with more than _____ negligence.  To be clear, the blank in our paraphrase is intentional.   For more than 25 years now, our case law regarding a deliberate-indifference claim's mens rea element has been hopelessly confused, resulting in what we'll charitably call a "mess."  We've tried to clean up that mess at least twice, but seemingly to no avail, as panels continue to flip-flop between two competing formulations: "more than *mere* negligence" and "more than *gross* negligence."   We find it necessary to address the mens rea issue once again—this time, we hope more definitively . . . .

<u>Id.</u> at 1370–71 (internal citation omitted).  Ultimately, the court determined that the prior-panel-precedent rule compelled the court to follow the "more than gross negligence" standard expressly adopted by the panel in <u>Townsend v. Jefferson County</u>, 601 F.3d 1152, 1158 (11th Cir. 2010).[15]   <u>Wade</u>, 67 F.4th at 1373.  Thus, incorporating this clarified standard, to satisfy the subjective component of an Eighth Amendment deliberate-indifference claim after <u>Wade</u>, "a plaintiff must establish that the defendant (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than *gross* negligence." <u>Id.</u> at 1374.

---

[15]  "[U]nder [the Eleventh Circuit's] prior-panel-precedent rule, a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by [the Eleventh Circuit] court sitting *en banc*." <u>In re Lambrix</u>, 776 F.3d 789, 794 (11th Cir. 2015) (internal quotations omitted).

(1)      **Subjective Knowledge**

Subjective knowledge of the risk requires that the defendant be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." Farmer, 511 U.S. at 837.  It also requires the defendant to "draw the inference."  Id.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  Id. at 842.  Furthermore, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id.

Viewed in the light most favorable to Plaintiff, a reasonable jury could find that Hall, as a medical professional, subjectively knew Plaintiff faced a serious risk when he presented to her.  As set forth previously, there is no question that, on June 5, Hall knew that Plaintiff had diabetes, PVD, and prior amputations on his left foot, and that he had been sent to the wound care clinic for what the form termed a "diabetic foot ulcer."  (See doc. 108-1, p. 15; see also doc. 120, pp. 31–32.)  The risk of amputation for patients with diabetes and PVD who develop infections on their lower extremities is well-documented in the record.  (See generally docs. 92-5, 92-6, 92-7, 92-8.)  Indeed, Hall herself testified that she had dealt with toe infections in individuals with diabetes and that, in her opinion, diabetics "have a higher risk [of amputation]." (Doc. 120, pp. 27–28.)  Additionally, there is evidence that Hall specifically appreciated the condition of Plaintiff's toe.  Plaintiff testified that when he presented to Hall on June 5, he took off his shoe, which he stated was full of blood, and showed Hall his foot.  (Doc. 118, p. 52; doc. 138-2, p. 2.)  According to Plaintiff, Hall responded, "Oh I guess we ought to do something about that," and they went to the E.R. to have the dressings changed.  (Doc. 118, pp. 52–53.)  Plaintiff testified

that, when the nurse unwrapped it, Hall said, "Don't be showing me shit like that, it will make me lose my lunch."  (Id. at p. 53.)

Finally, Hall testified that, when she saw Plaintiff on June 5, "the records from the wound care clinic had been obtained and were on his chart, and [she] signed that [she] reviewed [them] . . ." (Doc. 92-4, p. 5.)  These records stated that Plaintiff's left foot had a "pitting edema" and no palpable pulse, a weak dorsalis pedis pulse, and no posterior tibial pulse.  (Doc. 119-2, p. 12.)  The records described Plaintiff's wound as a "diabetic ulcer" that was worsening due to "poor circulation," stated that the toe looked like it was almost autoamputated, and noted that "there is tendon exposed," a "large amount of serosanguineous drainage," and "a medium (34-66%) amount of necrotic tissue within the wound bed." (Doc. 137-1, p. 22 (quoting doc. 119-2, pp. 15, 17).)  The records additionally provided that "a follow-up appointment should be scheduled" and that Plaintiff "surely will need another vascular eval[uation]" because, the wound care physician suspected, Plaintiff "may not have adequate circulation to heal [his] toe ulcer."  (Id. (quoting doc. 119-2, p. 18).)  Moreover, while not indicated in the wound care clinic records, Hall documented in the June 5 encounter form that Plaintiff "stated he was told by wound clinic that he was supposed to [follow up with] Vascular to have an amputation."  (Doc. 108-1, p. 15.)

In light of the above, a reasonable jury could find that Plaintiff's medical issues were grave and obvious and that, on June 5, Hall subjectively knew and inferred that Plaintiff faced a substantial risk of serious harm.  See Keele v. Glynn Cnty., 938 F. Supp. 2d 1270, 1296 (S.D. Ga. 2013) ("Because the seriousness of [the plaintiff's] medical needs was obvious, the Court must conclude . . . that [the defendant nurse] subjectively knew that [the plaintiff] faced a substantial risk of serious harm.").

### (2)    Disregard of the Risk by Conduct that is More than Gross Negligence

After showing Hall's awareness of the substantial risk of harm, Plaintiff must then show that Hall disregarded that risk by conduct that is more than grossly negligent. Wade, 67 F.4th at 1374.  "[M]ore than gross negligence" is "'the equivalent of recklessly disregarding' a substantial risk of serious harm to the inmate." Id. at 1375 (quoting Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1991)).  A defendant may disregard a risk with more than gross negligence by, among other conduct, "intentionally failing or refusing to obtain medical treatment, delaying treatment, providing grossly inadequate or inappropriate diagnosis or treatment, deciding to take an easier but less efficacious course of treatment, or providing medical treatment that is so cursory as to amount to no medical treatment at all."  Davison v. Nicolou, No. 6:16-cv-039, 2016 WL 6404034, at *5 (S.D. Ga. Oct. 27, 2016) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)).

A reasonable jury could find that Hall recklessly disregarded the serious risk to Plaintiff's health.  As noted above, Plaintiff claims that when the ER nurse took off his bandages on June 5, Hall exclaimed, "Don't be showing me shit like that, it will make me lose my lunch," and proceeded to walk out of the ER and have the nurse attend to his foot. (Doc. 118, p. 53.)  According to Plaintiff, Hall "literally only looked at [his] foot for about half a second." (Doc. 138-2, p. 2.)  Though Hall denies making this statement, that merely raises a factual dispute for the jury to resolve.  Moreover, the Court disagrees with Hall's contention that this statement is irrelevant.  (Doc. 92-4, p. 6.)  Hall conceded that she reviewed the wound care clinic's records which, as noted above, specifically stated that Plaintiff's toe was "almost auto[]amputate[ed]." (Doc. 119-2, p. 12; doc. 120, pp. 21–22, 31–32.)  Moreover, Plaintiff told Hall that the wound care clinic told him that he needed to

receive vascular care.  In light of this evidence and the totality of the information concerning Plaintiff's grave condition—of which, under a construction most favorable to Plaintiff, Hall was fully aware—a jury easily could find that Hall's cursory evaluation of Plaintiff's foot and failure to refer him for vascular treatment, particularly after her alleged comment about losing her lunch, rises to the level of a reckless disregard of Plaintiff's medical needs.  See Hardy v. Ga. Dep't of Corr., No. 1:17-cv-172, 2021 WL 3610466, at *7 (S.D. Ga. Aug. 13, 2021) (treating doctor's dismissive statements in response to diabetic plaintiff's complaints of pain as circumstantial evidence that the doctor disregarded the plaintiff's serious medical need).

Hall contends that her conduct was not more than grossly negligent because "the evidence shows that she took reasonable steps to ensure that [Plaintiff] received treatment for his toe infection."  (Doc. 92-2, p. 13.)  She contends that she started Plaintiff on the antibiotic Clindamycin and instructed him to ask the wound care clinic about a referral to a vascular specialist at his follow-up in two weeks.  (Id. at p. 15.)  However, as noted above, Plaintiff contends that Hall never prescribed him Clindamycin or any other antibiotic.  See note 3, supra.  Moreover, although the encounter form documenting Hall and Plaintiff's June 5 appointment suggests that Hall took these steps, (doc. 108-1, p. 15), that does not preclude a finding that Hall's conduct exceeded gross negligence.  "[A]n inmate is constitutionally entitled to medical care that is adequate to meet the needs of their particular situation."  Brooks v. Wilkinson Cnty., 393 F. Supp. 3d 1147, 1164 (M.D. Ga. 2019).  A jury could find that, by refusing to truly evaluate Plaintiff on June 5, Hall did not even evaluate the needs of Plaintiff's particular situation much less attempt to provide care adequate to meet those needs.  For instance, even assuming that Hall prescribed Plaintiff

Clindamycin on June 5, this could potentially cut *towards* a finding of deliberate indifference; just one month prior, Wilson had *discontinued* Clindamycin and prescribed a different antibiotic because, according to Wilson, Plaintiff's infection "had not improved." (Doc. 121, pp. 30–31; see doc. 137-1, p. 12.)  Indeed, the encounter form from May 3, 2019, contained in Plaintiff's medical records—with which Hall testified she was familiar, (see doc. 92-4, p. 6)—explicitly states that Plaintiff's toe infection was "not responsive to Clindamycin [for] 9 days," (doc. 108-1, p. 30).  In essence, a jury could find that Hall failed to truly evaluate Plaintiff on June 5 and, therefore, provided him cursory treatment that was not designed, much less sufficient, to meet the specific needs he presented on that date and even conflicted with his prior course of treatment.

Additionally, a jury could find that it was reckless for Hall to instruct Plaintiff to ask about a referral rather than to request that referral herself, or, at the very least, to ask Awe whether such a referral would be appropriate.  Hall concedes that she is "not a specialist in wound care or in the treatment of type II diabetes or in [PVD]." (Doc. 92-4, p. 6.)  Plaintiff's expert, Dr. Powers, opined that Plaintiff's presentation on June 6 is an example of a situation where escalation to someone with a higher level of expertise and skill was required.[16]  (Doc. 61, p. 6.)  Despite this admitted lack of qualifications, Hall testified that she did not request or inquire about a referral to a vascular surgeon or specialist because "[t]here was no [such] referral" in the wound care clinic records.  (Doc.

---

[16] Defendants have moved to exclude certain bolded portions of Powers' expert report on the grounds that they are improper legal conclusions and are "not proper areas for expert testimony." (Doc. 93, pp. 5–8.)  Defendants ask that the Court refuse to consider the statements in ruling on Hall's Motion.  The Court has not considered any of the objected-to statements in its analysis. Accordingly, the Court **DENIES as moot** the Motion.  (Doc. 93.)  This denial is **WITHOUT PREJUDICE** and thus, to the extent that Defendants seek to exclude the bolded portions from being considered *at trial*, they can re-raise their objections at a later date.

92-4, pp. 5–6.)  According to Hall, "[t]here is no direct evidence in this case that [she] knew that escalation or referral to a vascular surgeon was required when she interacted with [Plaintiff]."  (Doc. 92-2, p. 16.)  The record, when viewed in the light most favorable to Plaintiff, belies this assertion.  During her deposition, Hall conceded that the wound clinic indicated it "want[ed] to look at previous records[] and that [it] most likely would want a referral."  (Doc. 120, p. 21.)  Indeed, as noted above, Hanzel (the physician who evaluated Plaintiff at the wound care clinic) included in the records of the wound care visit that he "would like to get vascular eval[uation] and angio[gram] results from [Plaintiff's] last hospitalization" and that Plaintiff "*surely* will need another vascular eval[uation]" because, Hanzel suspected, Plaintiff "may not have adequate circulation to heal [his] toe ulcer."  (Doc. 119-2, p. 18 (emphasis added).)  Hanzel also noted in the wound care records that Plaintiff had "no palpable pulse" in his left foot and that Plaintiff's wound "look[e]d like almost auto amputation."  (Id. at p. 12.)  Viewed in conjunction with the objective medical evidence as well as Plaintiff's statement to Hall during their June 5 encounter that Hanzel recommended he see a vascular surgeon to have the toe amputated, a jury could find that Hall's failure to take any action towards having Plaintiff see a vascular specialist or surgeon was more than grossly inadequate and essentially amounted to a complete disregard of his vascular condition.

Hall maintains that her decision "not to pursue a particular course of treatment is a classic example of a medical judgment, an exercise of which does not represent cruel and unusual punishment."  (Doc. 92-2, p. 15.)  According to Hall, "[w]here a prisoner has received . . . medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize

claims that sound in tort law." (Id. at p. 16 (quoting Hamm v. Dekalb Cnty., 774 F.2d 1567, 1575 (11th Cir. 1985)).) "Although courts hesitate to find an Eighth Amendment violation when an inmate has received medical care, [the Eleventh Circuit] has cautioned that such hesitation does not mean . . . that the course of . . . treatment of a prison inmate's medical . . . problems can never manifest deliberate indifference." Kruse v. Williams, 592 Fed. App'x. 848, 858 (11th Cir. 2014) (internal quotations omitted) (ellipses in original).

As an initial matter, Hall's argument on this front appears to contradict her contention that she simply complied with the wound care clinic's directions to schedule Plaintiff for a follow-up in two weeks and to continue daily dressing changes. (Doc. 92-2, pp. 14–15.) That contention suggests that Hall did not exercise independent medical judgment or opt for a course of treatment she deemed appropriate based upon her review of Plaintiff's condition on June 5. A jury could find that rather than evaluating and treating Plaintiff, Hall essentially rubber-stamped the wound care clinic's orders, as she understood them, without considering whether a referral (or some other course of treatment) was medically necessary. During Hall's deposition, opposing counsel asked her, "[Y]ou didn't see the need at the time . . . to refer him to either a vascular surgeon, or to send him to a hospital emergency room, is that right?" (Doc. 120, p. 35.) Hall responded, "I transcribe as the wound clinic orders, because that's what I was seeing him for, a follow-up wound clinic." (Id.) Counsel then asked Hall whether it was accurate that, "based on [her] review of . . . what [she] saw, [she] didn't personally see the need to either send [Plaintiff] to a vascular surgeon as . . . an urgent or emergent referral, or to send him straight to the hospital ER?" (Id.) Hall responded, "Well, I was seeing him for a follow-up wound clinic visit. He had just been seen by the wound clinic, and they didn't necessarily directly say that he

needed to go to see the vascular surgeon, so the consult wasn't written." (<u>Id.</u> at pp. 35–36.)  Finally, when asked whether she was "kind of following wound care's lead," Hall said, "Right.  I transcribed it from the wound clinic, which are the specialists, which is why we sent him to wound clinic." (<u>Id.</u> at p. 36.)  From this testimony, a jury could find that Hall, a P.A. and (according to her own sworn testimony) an ALP at the Prison, blindly followed what she perceived to be the wound clinic's orders without meaningfully evaluating Plaintiff's condition or considering whether another course of action was necessary.  Moreover, as explained above, the wound care clinic's records contained ample evidence that Plaintiff's condition had grossly deteriorated and that he needed treatment from a vascular specialist.  Thus, the jury could reject Hall's contention that she read and followed the wound care clinic's directions.

The Court recognizes that deliberate indifference is a high bar, and Plaintiff cannot clear it by simply pointing to a more preferable course of treatment or a bad outcome. However, in this case Plaintiff has produced evidence from which a jury could find that Hall's treatment of Plaintiff's condition amounted to no treatment at all.  The evidence would permit a finding that Hall merely glanced at Plaintiff's toe despite his having presented to her for a follow-up from a referral to the wound clinic, that she only prescribed an antibiotic that had recently been discontinued for being ineffective and that would not in any event address the dire vascular conditions that he was facing, that she ignored evidence of his deteriorating condition, such as statements in the wound care clinic's notes that Plaintiff would need to be seen by a vascular surgeon, and that she failed to exercise the independent medical judgment called for by her position and Plaintiff's condition. Accordingly, a jury could find that Hall's conduct went beyond gross negligence and

summary judgment is not warranted in Hall's favor on this issue.   See Carswell v. Bay

Cnty., 854 F.2d 454, 457 (11th Cir. 1988) (finding that there was sufficient evidence of

deliberate indifference where, although the defendant-physician provided some treatment

to the plaintiff, he ignored warnings that the plaintiff's condition was deteriorating and did

"nothing significant to ensure that [he] received medical attention").

For these reasons, the Court **DENIES** Hall's Motion for Summary Judgment as to

the subjective component of Plaintiff's deliberate indifference claim.

### C.    Qualified Immunity

Hall contends, in the alternative, that she is entitled to qualified immunity because

she was acting within her discretionary authority, her conduct did not rise to the level of

deliberate indifference, and she did not violate clearly established law.  (Doc. 92-2, pp. 17–

19.)

"Qualified immunity protects government officials performing discretionary

functions from suits in their individual capacities unless their conduct violates 'clearly

established statutory or constitutional rights of which a reasonable person would have

known.'"  Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer,

536 U.S. 730, 739 (2002)).  To obtain qualified immunity, a defendant first must show that

he acted within his discretionary authority.  Mobley v. Palm Beach Cnty. Sheriff Dep't,

783 F.3d 1347, 1352 (11th Cir. 2015).  Plaintiff does not dispute, and the record adequately

supports, that Hall was acting within her discretionary authority as a P.A. at the Prison

when she provided the challenged treatment to Plaintiff.  (See generally doc. 138, pp. 24–

26.)

Once a defendant establishes that she was acting within the scope of her discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Nam Dang ex rel. Vina Dang v. Sheriff, Seminole Cnty., 871 F.3d 1272, 1279 (11th Cir. 2017). To make this showing, Plaintiff "must first prove that the facts alleged, construed in the light most favorable to [him], establish that a constitutional violation did occur." Shaw v. City of Selma, 884 F.3d 1093, 1099 (11th Cir. 2018). If Plaintiff establishes that a constitutional violation occurred, he then must demonstrate "that law existing at the time the conduct occurred clearly established that the conduct violated the constitution." Id.

The Court has already found that Plaintiff has raised a genuine dispute of fact as to whether Hall acted with deliberate indifference to his serious medical needs. See Discussion Sections, III, A–B. Additionally, Plaintiff has shown that such deliberate indifference would violate clearly established law. "The standard for determining whether a right is well-established for purposes of qualified immunity is whether the right violated is one about which a reasonable person would have known." Sparks v. Ingle, 724 F. App'x 692, 693 (11th Cir. 2018). In other words, the defendant must have "fair warning" that his or her conduct violated a constitutional right, which exists when there is "binding caselaw from the Supreme Court, the Eleventh Circuit, or the highest court of the state . . . that make[s] it obvious to all reasonable government actors . . . that what he [or she] is doing violates a federal law." Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (internal quotation omitted).

Decisions from the Supreme Court and the Eleventh Circuit gave Plaintiff "fair warning" that her alleged misconduct was unconstitutional. Id. In Estelle, the Supreme

Court held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." 429 U.S. at 104 (internal citations and quotations omitted). Additionally, "[t]he Eleventh Circuit has . . . stated in dicta that '[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law.'" Gartman v. Cheatham, No. 2:18-CV-534-MHT, 2021 WL 96467, at *9 (M.D. Ala. Jan. 11, 2021) (quoting Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994), *overruled in part on other grounds by* Hope, 536 U.S. 730). It has long been established that providing an easier or less efficacious course of treatment or grossly inadequate care constitutes deliberate indifference. See Waldrop, 871 F.2d at 1035; Steele v. Shah, 87 F.3d 1266, 1269–70 (11th Cir. 1996). Indeed, in 1988, the Eleventh Circuit held that a jail administrator who saw an inmate's deteriorating condition and was asked to get the inmate to a doctor could have been found deliberately indifferent for doing "nothing significant to ensure that [the inmate] received medical attention." Carswell, 854 F.2d at 457. Moreover, in 2007, the Eleventh Circuit found that "a decision to withhold medical care no matter what the circumstances actually were . . . is deliberate indifference to the true facts of an inmate's medical condition and needs." Goebert, 510 F.3d at 1329.

As already set forth in detail, the evidence, viewed in Plaintiff's favor, supports a finding that during Hall's June 5 follow-up to Plaintiff's wound care visit—the notes from which indicated that Plaintiff's toe was "almost auto-amputated"—Hall conducted an extremely cursory evaluation of Plaintiff's foot and ignored obvious signs that he had a

severe medical need.  There is also evidence that Hall ignored Plaintiff's statement that he was told to see a vascular surgeon to have his toe amputated and ignored the wound care records that stated that Plaintiff "surely" will need another vascular evaluation and described in detail the poor condition of Plaintiff's toe.  Additionally, the evidence indicates that despite all indications of Plaintiff's grave condition, the only action Hall took, and even this action is disputed, was prescribing an antibiotic to Plaintiff that, as memorialized in Plaintiff's records, had been discontinued a few weeks prior for being ineffective.  Additionally, the jury could determine that Hall failed to meaningfully evaluate Plaintiff's condition because she pre-determined that her role was merely to copy the wound clinic's orders.  Put succinctly, the jury could determine that Hall's cursory treatment of Plaintiff amounted to no treatment at all.  In light of precedent from this Circuit and the Supreme Court referenced above, most notably <u>Carswell</u>, a reasonable person would have known that Hall's conduct, when viewed in the light most favorable to Plaintiff, violated clearly established law.

Accordingly, the Court **DENIES** Hall's alternative request for summary judgment based on qualified immunity.

## IV.   Plaintiff's Motion for Reconsideration (Doc. 100)

Plaintiff asks the Court to reconsider its Order granting Defendants' prior motion for judgment on the pleadings as to Plaintiff's deliberate indifference claim against Awe, (doc. 64).  (Doc. 100-1, pp. 22–26.)  In the Order, the Court found that the Complaint failed to allege facts showing that Awe possessed the requisite knowledge to support a deliberate indifference claim or acted with "more than mere negligence."[17]  (Doc. 64, pp. 8–15.)

---

[17]  The Court framed the standard as "more than *mere* negligence" rather than "more than *gross* negligence," as it has in this Order, because <u>Wade</u>, 67 F.4th at 1366, had not yet been published.

The decision to grant a motion for reconsideration is committed to the sound discretion of the district court. <u>Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.</u>, 225 F.3d 1208, 1216 (11th Cir. 2000). Motions for reconsideration are to be filed only when "absolutely necessary" where there is: (1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. <u>Bryan v. Murphy</u>, 246 F. Supp. 2d 1256, 1258–59 (N.D. Ga. 2003); <u>Collins v. Int'l Longshoremen's Ass'n Loc. 1423</u>, No. 2:09-cv-093, 2013 WL 393096, at *1 (S.D. Ga. Jan. 30, 2013). Motions for reconsideration are not appropriate to present the Court with arguments already heard and dismissed, to repackage familiar arguments, or to show the Court how it "could have done it better" the first time. <u>Pres. Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs.</u>, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995); <u>Pottayil v. Thyssenkrupp Elevator Corp.</u>, 574 F. Supp. 3d 1282, 1301 (N.D. Ga. 2021). Furthermore, because reconsideration "is an extraordinary remedy to be employed sparingly," the movant "must set forth facts or law of a strongly convincing nature to induce the [C]ourt to reverse its prior decision." <u>Armbuster v. Rosenbloom</u>, No. 1:15-cv-114, 2016 WL 1441467, at *1 (S.D. Ga. Apr. 11, 2016).

### A.    Plaintiff's Judicial Notice Argument

Plaintiff first argues that facts already within the Court's knowledge raised a reasonable expectation that discovery would reveal evidence supporting his deliberate

---

(<u>See</u> doc. 64, p. 9.) To be sure, the Court's analysis in the Order is not undermined by <u>Wade</u>'s clarification that the standard is "more than gross negligence" rather than "more than mere negligence" because if the Complaint did not allege enough to meet the former version of the standard, it most certainly would not have been able to meet the latter standard (which is more burdensome on plaintiffs as it requires a stronger allegation of negligence).

indifference claim against Awe.  (Doc. 100-1, p. 22.)  According to Plaintiff, the Court could have taken, and now should take, judicial notice of certain "facts" derived from Awe's sworn statements in prior lawsuits filed against him in this Court.  (Id. at pp. 23–24.)  Specifically, Plaintiff asks the Court to take judicial notice of the fact that Awe was the Prison's medical director as well as other facts concerning his supervisory responsibilities, arguing that these facts are "generally known within the [Court's] territorial jurisdiction" because they were stated in submissions in prior lawsuits against Awe.[18]  (Id.)  According to Plaintiff, these facts, along with the Complaint's allegations, "raise a reasonable expectation that discovery would reveal evidence that Dr. Awe had access to [Plaintiff's] medical history records, examined those records, [and] had subjective knowledge that Plaintiff was a high-risk vascular patient."  (Id. at p. 24 (internal quotations omitted) (quoting doc. 64, p. 14).)

This argument fails for multiple reasons.  As a preliminary matter, "the Eleventh Circuit has distinguished between taking judicial notice of the fact that court records or court rulings *exist* versus taking judicial notice of the *truth* of matters stated within those court records or court rulings."  Campo v. Granite Servs. Int'l, Inc., 584 F. Supp. 3d 1329, 1336 (N.D. Ga. 2022).  Specifically, courts "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  United States v. Jones, 29 F.3d

---

[18]  Plaintiff also appears to argue that certain allegations in the Complaint, such as Paragraph 38, plausibly showed that Awe refused to treat or withheld treatment from Plaintiff.  (See doc. 100-1, p. 24 (arguing the allegation is enough to support an inference that Awe "refused to treat Plaintiff" because it alleges that no one examined his toe from May 3–28).)  This is an attempt to re-litigate an issue that has already been decided.  (See doc. 64, pp. 14–15.)  The Complaint's allegations are not "newly discovered evidence," and, thus, are not an appropriate basis for reconsideration.

1549, 1553 (11th Cir. 1994) (internal quotations omitted).  Plaintiff's request for judicial

notice of Awe's position and responsibilities at the Prison exceeds that limited purpose.

Plaintiff does not seek judicial notice simply to "establish the fact of such litigation and

related filings"; he is attempting to establish the truth of assertions made in these cases and

then to extrapolate that these facts show Awe possessed the requisite subjective knowledge

for deliberate indifference.  This is impermissible.  See Campo, 584 F. Supp. 3d at 1336

(refusing to take judicial notice of a declaration filed in a separate case because the

defendants sought "to establish the truth of the assertions contained in the filing itself");

Collier HMA Physician Mgmt., LLC v. NCH Healthcare Sys., Inc., No. 218-CV-408-

FTM-38-MRM, 2019 WL 277733, at *3 (M.D. Fla. Jan. 22, 2019) (declining to take

judicial notice of "the accuracy of the factual allegations, arguments, or legal conclusions

contained within the state court filings").

Moreover, even if the Court were to take judicial notice of Plaintiff's proffered

facts, this would not be a sufficient basis to grant Plaintiff's Motion to Reconsider.  Setting

aside whether Awe's sworn statements in other lawsuits would actually constitute "[n]ewly

discovered evidence" that could justify reconsideration, Plaintiff fails to explain *how*

Awe's statements make his deliberate indifference claim any more plausible.  As identified

in the Court's Order, the Complaint fails "to allege that . . . Awe had access to Plaintiff's

medical history records, examined those records, or had subjective knowledge that Plaintiff

was a 'high-risk vascular patient.'"  (Doc. 64, p. 14.)  This deficiency was relevant in the

Court's analysis because Plaintiff had to plausibly demonstrate, *inter alia*, that Awe

subjectively knew Plaintiff faced the risk of serious harm in order to avoid dismissal for

failure to state a claim.  Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995).

Plaintiff contends in conclusory fashion that Awe's sworn statements would address this shortcoming yet fails to explain how Awe's status as the Prison's medical director plausibly shows that Awe subjectively knew Plaintiff confronted a risk of serious harm.  (See generally doc. 100-1, pp. 23–24.)

Finally, even if Plaintiff had done so, this *still* would not have been enough to state a claim for deliberate indifference because the Complaint's allegations did not plausibly allege that Awe acted with the requisite level of negligence.  Indeed, the Court explicitly said so in the Order.  (See doc. 64, p. 15 ("[E]ven if the Complaint alleged that . . . Awe was subjectively aware that Plaintiff was a 'high-risk vascular patient,' Plaintiff still failed to allege facts sufficient to establish that . . .  Awe showed such indifference that can offend evolving standards of decency in violation of the Eighth Amendment.") (internal quotations omitted).)

Accordingly, the Court rejects Plaintiff's Motion for Reconsideration on this basis.

**B.    Evidence Brought to Light in Discovery**

Plaintiff next argues that the Court should reconsider its Order because a jury could find Awe was deliberately indifferent based on evidence brought to light during discovery that shows "Awe's brazen and callous lack of concern for [Plaintiff]."  (Doc. 100-1, pp. 24–25.)  The Court disagrees.  The only evidence Plaintiff points to in support is an exchange during Awe's deposition in which Awe insinuated that Plaintiff may have used a wheelchair because he was lazy and wanting pity.  (Id. at p. 25 (citing doc. 119, pp. 67–68 (Awe speculating that Plaintiff did not really need to use a wheelchair but just did not want to exercise).)  However, this testimony provides no insight into the treatment of Plaintiff's toe and, aside from broadly asserting that such statements could support a

punitive damages claim,[19] Plaintiff provides no explanation as to how this testimony could lead a jury to find that Awe's conduct from April 23 until Plaintiff's toe was amputated on June 7 violated the Eighth Amendment.  Therefore, the Court will not reconsider its Order on the basis of this testimony.

In sum, Plaintiff has failed to persuade the Court that it should reconsider its Order dismissing Plaintiff's deliberate indifference claim against Awe, and, accordingly, Plaintiff's Motion for Reconsideration is **DENIED**.  (Doc. 100, pp. 22–26.)

## CONCLUSION

Based on the forgoing, the Court **GRANTS** GDC's Motion for Summary Judgment as to the claims asserted against it because the Court finds that its sovereign immunity has not been waived.  (Doc. 90.)  Accordingly, the Court **DISMISSES** all claims against GDC and dismisses it from the case.  The Court **DIRECTS** the Clerk of Court to update the docket accordingly.  The Court **DENIES** BOR's Motion for Partial Summary Judgment as to Plaintiff's claims based on Wilson's alleged negligence because there is a genuine dispute of fact as to Wilson's employment status, which precludes a finding as to whether BOR has waived its sovereign immunity for claims arising from her alleged misconduct. (Id.)  The Court **DENIES** Hall's Motion for Summary Judgment because sufficient evidence exists to support a verdict in Plaintiff's favor on his deliberate indifference claim

---

[19]  To the extent Plaintiff argues that it would be unfair to "let Awe off the hook individually" because it would limit Plaintiff's ability to recover punitive damages, this argument fails.  (Doc. 100-1, pp. 25–26.) Plaintiff reasons that he will not be able to recover punitive damages against GDC or BOR because punitive damages may not be awarded against the state under the GTCA. (Id.) Plaintiff has not pointed to—and the Court has not found—any authority which supports the proposition that a decision that limits a plaintiff's ability to recover punitive damages or reduces the value of a potential award is manifestly unjust or fundamentally unfair.  (Id.)  The Court finds that this concern is far too speculative to warrant reconsideration of the Order.

against her and Hall has not proven she is entitled to qualified immunity.  (Doc. 92.)  The Court **DENIES as moot, and without prejudice,** BOR, GDC, and Hall's Motion to Exclude portions of Plaintiff's proffered expert's opinion.  (Doc. 93.)

The Court **GRANTS in part and DENIES in part** Plaintiff's Motion for Partial Summary Judgment.  (Doc. 100.)  Specifically, the Court finds that Awe and Hall were employees of GCHC during all relevant times and, thus, BOR has waived its sovereign immunity for claims arising from their negligence, and the Court, therefore, **GRANTS** Plaintiff summary judgment on this issue.  However, the Court finds there is a genuine dispute of fact as to whether Wilson was an employee of GCHC or was an independent contractor, precluding a finding that BOR has waived its sovereign immunity from claims arising from Wilson's alleged negligence.  Thus, the Court **DENIES** Plaintiff summary judgment as to this issue.  The Court also **DENIES** Plaintiff's request for summary judgment in his favor on the issue of whether GDC's sovereign immunity has been waived. Next, the Court **DENIES** Plaintiff's request that the Court enter summary judgment in his favor "find[ing] that the standard of care is determined by" certain specified SOPs, standards, and guidelines (in addition to the testimony of Plaintiff's experts).[20]  (See doc. 100, p. 2.)  The Court also **DENIES** Plaintiff's request for summary judgment regarding whether the standard of care was violated prior to April 23, 2019 (the date set forth in the ante litem notice).  The Court also **DENIES** Plaintiff summary judgment on his claims that GCHC violated the standard of care when its employees purportedly ignored requests to re-examine Plaintiff's foot and also when its employees failed to refer Plaintiff to a vascular

---

[20]  As explained earlier within this Order, the written standards proffered by Plaintiff are relevant in determining the standard of care, but they do not, in and of themselves, *establish* the standard of care.

surgeon after he presented for care on or about April 25 through 26, 2019, on May 3, 2019, on May 16, 2019, on May 30, 2019, and on June 5, 2019.  These latter two issues are for a factfinder to determine.

The Court **GRANTS in part and DENIES in part** Plaintiff's Motion to Exclude portions of Defendants' experts' opinions.  (Doc. 100.)  Specifically, the Court **GRANTS** Plaintiff's Motion to exclude Fowlkes' opinion that Defendants met the standard of care as well as his opinion that Defendants did not cause Plaintiff's injuries.  The Court also **GRANTS** Plaintiff's Motion to exclude Horn's opinion that Defendants met the standard of care, but the Court **DENIES** Plaintiff's Motion to exclude Horn's opinion that Defendants did not cause Plaintiff's injuries.

Finally, the Court **DENIES** Plaintiff's Motion to reconsider the Court's Order dismissing Plaintiff's Section 1983 claim against Awe because Plaintiff has failed to convince the Court that reconsideration is necessary or warranted.  (Id.)

**SO ORDERED**, this 8th day of September, 2023.

_____

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA